## COMMONWEALTH *vs.* TYRONE SEALY.

Suffolk. January 9, 2014. - April 1, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, DUFFLY, & LENK, JJ.

*Rape. Constitutional Law,* Confrontation of witnesses. *Practice, Criminal,* Confrontation of witnesses, Discovery, Waiver. *Evidence,* Cross-examination, Impeachment of credibility, Motive, Bias, Relevancy and materiality, Privileged record. *Witness,* Cross-examination, Impeachment, Bias. *Alien.*

At a rape trial in which the defense was consent (i.e., that the victim, an undocumented immigrant, made her allegation in order to obtain immigration benefits), the exclusion of evidence of a prior, unrelated sexual assault allegation by the victim and the resultant immigration benefit she received did not violate the defendant's rights to confront the witnesses against him or to present a defense, where the judge's restraint of the defendant's cross-examination of the victim neither constituted an abuse of discretion, in that evidence of the victim's motive to lie was sufficiently aired, nor prejudiced the defendant, in that the defendant did not show that evidence of the prior allegation clearly was relevant to a motive to lie; moreover, further evidence of the victim's motive to lie (in regard to immigration consequences) likely would have had little impact on the jury, given the substantial other evidence corroborating the victim's testimony. [623-625]

This court declined to address whether the protocol announced in *Commonwealth* v. *Dwyer,* 448 Mass. 122 (2006), governing production of statutorily privileged records from third parties, extends to records protected by the attorney-client privilege, where the criminal defendant did not make a threshold showing of entitlement to the records sought, in that neither the defendant's motion for production of third-party records nor the supporting affidavit, which contained allegations couched in hypothetical language, was sufficient to meet his initial burden of demonstrating the relevance of the records. [625-628]

There was no error in the denial of a criminal defendant's posttrial motion for discovery of records protected by the attorney-client privilege. [628-629]

INDICTMENT found and returned in the Superior Court Department on June 22, 2006.

A pretrial motion for production of privileged third-party records was heard by *Carol S. Ball,* J.; the case was tried before *Thomas E. Connolly,* J.; a motion for posttrial discovery was

heard by him; and a motion for a new trial, filed on January 21, 2010, was considered by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*James A. Reidy* for the defendant.

*Amanda Teo*, Assistant District Attorney (*Holly Broadbent*, Assistant District Attorney, with her) for the Commonwealth.

*Susan M. Finegan, Andrew N. Nathanson, John B. Koss, & Kimberly A. Parr*, for Boston Area Rape Crisis Center & others, amici curiae, submitted a brief.

*Eric A. Haskell, Anthony D. Mirenda, Jennifer Kirby Tanney, Stacy A. Malone, & Lindy L. Aldrich*, for Victim Rights Law Center & others, amici curiae, submitted a brief.

LENK, J. After a jury trial in the Superior Court, the defendant was convicted of rape. His defense at trial was consent; he maintained that the victim, an undocumented immigrant, characterized consensual sex as rape in her report to police in order to obtain immigration benefits, such as eligibility for a "U-Visa."[1] See 8 U.S.C. § 1101(a)(15)(U) (2012). The defendant timely appealed from his convictions to the Appeals Court, where proceedings were stayed so that he could pursue a motion for a new trial. The defendant's subsequent appeal from the denial of his motion for a new trial was consolidated with his direct appeal, and we transferred the case to this court on our own motion.[2]

The rape conviction arose from events that occurred on March

---

[1]Congress enacted the "U-Visa" program in 2000. Pub. L. 106-386. A U-Visa enables rape victims, among others, to reside lawfully in the United States for a period of four years, which may be extended upon certification by a law enforcement official that the individual's continued presence in the United States is necessary to assist in the investigation or prosecution of criminal activity. See 8 U.S.C. §§ 1101(a)(15)(U)(iii), 1184(p)(6) (2012). Once an individual has resided continuously in the United States for three years following the receipt of a U-Visa, he or she is eligible to apply for lawful permanent residency. See 8 U.S.C. § 1255(m) (2012).

[2]We acknowledge the amicus briefs on behalf of the Commonwealth from the Boston Area Rape Crisis Center, Dove, Inc., and Jane Doe Inc.; and from the Victim Rights Law Center, National Center for Victims of Crime, National Crime Victim Law Institute, and National Alliance to End Sexual Violence.

19, 2006.[3] The victim first complained of rape to the defendant's mother on March 21, and sought counselling at the Boston Area Rape Crisis Center (BARCC) on March 23. A BARCC staff member referred her to the Victims' Rights Law Center (VRLC). There, she met with an attorney with whom she discussed her concern that the defendant would attempt to have her deported if she reported the rape to police. At that point, the VRLC attorney informed the victim that she could apply for a U-Visa, to ensure that she could report the crime and still lawfully remain in the country. The victim reported the rape to police on March 24.

The defendant's argument on appeal centers on the victim's motive to lie for immigration-related reasons. Although the victim was cross-examined at trial on her knowledge of U-Visa eligibility before she reported the crime to police, the defendant claims that he was denied the right to impeach her with evidence of a prior incident of sexual assault in the early 1990s, after which she received a temporary work authorization. The defendant argues that such evidence demonstrated that, when the victim made her first complaint of rape to the defendant's mother, she knew that a report of rape was one means by which she lawfully could remain in the United States, and thus had a reason to fabricate her story from the outset.

The defendant also asserts that he should have been allowed access to BARCC records concerning the victim, notwithstanding any attorney-client privilege asserted on her behalf, because such access was necessary to preserve his constitutional rights to confrontation and to present a defense. In so doing, he asks us to extend the protocol announced in *Commonwealth* v. *Dwyer*, 448 Mass. 122 (2006) (*Dwyer*), governing production of statutorily privileged records from third parties, to records protected by the attorney-client privilege.

We conclude that the trial judge properly exercised discretion in precluding cross-examination concerning the circumstances of the victim's prior acquisition of a temporary work authorization. Because we determine that the defendant did not make a

---

[3]The defendant was acquitted of indecent assault and battery also arising out of the events of March 19, 2006. He was convicted of assault and battery, which stemmed from a separate incident that occurred on October 2, 2005.

threshold showing of entitlement to the BARCC records, we do not address whether the *Dwyer* protocol extends to records protected by the attorney-client privilege.

1. *Facts.* a. *Commonwealth's case-in-chief.* Based on the evidence at trial, the jury could have found the following.

i. *Victim's testimony.* The victim, an undocumented immigrant to the United States, met the defendant in 2004, and the two commenced a sexual relationship. As the relationship progressed, the victim became close to the defendant's family and joined his church. She often would spend time with the defendant's family at his mother's home, where he lived with his siblings. The defendant's mother became "like a mother" to her.

Eventually, the relationship began to change. The defendant would "get angry on the turn of a dime," causing the victim to have "reservations" about continuing the relationship. The defendant's volatile behavior culminated in his physical abuse of the victim on October 2, 2005, when he twice struck her in the face with his hand while they were driving home from church.

After that incident, the victim decided that she no longer wanted to be in a romantic relationship with the defendant. However, she still maintained contact with him and his family because they belonged to the same church. Although she had, for the most part, broken off sexual relations with the defendant,[4] he nevertheless was "trying to ease back into the relationship with [her]." In February, 2006, the victim began a twenty-one-day religious fast in order to pray and ask God "how to get [the defendant] to understand that [she] did not want to continue the relationship in an intimate way." A few days after her fast ended, on Saturday, March 18, 2006, the victim had dinner at the home of the defendant's mother, after which the defendant and the victim retired to the defendant's bedroom, where they could speak privately. The victim told the defendant that she had resolved during her fast no longer to be sexually intimate with him, since she believed that nonmarital sexual intercourse was a sin. There was no sexual contact between the two that night, although the victim changed out of some of her clothing into a large T-shirt belonging to the defendant.

---

[4]The two were last sexually intimate on November 2, 2005.

On Sunday, March 19, 2006, following church services with the defendant, the victim returned to the defendant's mother's house for dinner. The victim and the defendant later went to the defendant's bedroom to watch a movie, where the victim again changed into the defendant's T-shirt, which she wore over a bodysuit and two pairs of leggings. Eventually, the defendant joined the victim on the bed and began to "touch [her] and hold [her]." Although the victim told the defendant to stop and evaded his advances, he said, "I just want to have oral sex with you, I'm not going to penetrate you." He proceeded to pin her down, undo her bodysuit and pull off her leggings; he had oral sex with her, over her protests, and while her head was hitting the wall. The victim continued to plead with him to stop, but the defendant nonetheless persisted and ultimately penetrated her vagina with his penis. The defendant then accompanied her on the bus ride back to her home.

Two days later, on Tuesday, March 21, 2006, the victim disclosed the rape to the defendant's mother, informing her that she would not be returning to the house because the defendant had raped her. In the days following the rape, the defendant left twenty-six lengthy messages on the victim's cellular telephone, stating that he planned to find her, in addition to making various inculpatory statements regarding the events of March 19. On Thursday, March 23, 2006, seeking advice, the victim visited BARCC. She met with a BARCC counsellor,[5] and was referred to the VRLC.

The victim was concerned that the defendant would seek to have her deported if she accused him of rape; she was informed for the first time by a VRLC attorney that she could apply for a U-Visa, which would allow her to remain in the United States at least until the end of any ensuing trial, provided that she reported the rape to police. See 8 U.S.C. § 1101(a)(15)(U). The victim reported the rape to police on Friday, March 24, 2006, and subsequently applied for a U-Visa. The application was pending at the time of trial.

ii. *Other evidence at trial.* At trial, in addition to the victim, the prosecutor called the defendant's mother, who testified as

---

[5]The Boston Area Rape Crisis Center (BARCC) counsellor was also an attorney.

the first complaint witness, and also called three police officers. The arresting officer described the defendant's statement that he had "talked [the victim] into" having oral sex, and proceeded to penetrate her even after she told him not to, because they already had had oral sex. The prosecutor also played for the jury, in their entirety, the messages the defendant had left on the victim's cellular telephone, which the victim had turned over to the police. In the messages, the defendant "apologiz[ed] for taking advantage of" the victim and admitted to committing a sin, in addition to making numerous other incriminating statements regarding the rape and referring to having struck the victim on a separate occasion.

b. *Theory of defense.* As stated, the defense was one of consent; the defendant argued that both the victim's religious convictions and the positive immigration consequences of reporting a rape provided motives for her to lie. In the course of the victim's cross-examination, she testified that, a number of years previously, she had received a temporary work authorization, which expired in 1992. During the ensuing voir dire outside the presence of the jury, the victim testified that "Boston Legal Services" obtained the work authorization for her, because she was "in therapy with a psychologist" since "someone hurt [her]" in a sexual manner.[6] She did not report the incident to police and did not know whether the perpetrator had been prosecuted. The defendant sought to explore the circumstances of the victim's prior work authorization, in order to show that she might have obtained it under false pretenses, which would bear on her credibility as a witness.[7]

Following the voir dire, however, the judge precluded further cross-examination on the issue of the victim's prior work authorization, ruling that any relevance it might have had was far

---

[6]As discussed, see note 1, *supra*, the U-Visa program was not in effect in the early 1990s; it was established in 2000. The precise nature of the victim's prior work authorization is unclear.

[7]The defendant's theory on appeal is that the victim's pre-1992 knowledge of the connection between experiencing sexual assault and receiving immigration benefits gave her a motive to lie in this case; the focus is not upon whether the victim in fact had been sexually assaulted before. However, at trial, the defendant attempted to show that the victim might have lied in the past about a prior sexual assault in order to obtain a work authorization in the past.

outweighed by its prejudicial impact. The defendant's cross-examination thereafter focused on the circumstances of the victim's 2006 U-Visa application, including the point at which she learned of her eligibility from a VRLC attorney, and the extent of her knowledge of the visa's requirements and benefits.[8]

*2. Discussion.* a. *Exclusion of evidence of immigration benefits attendant upon victim's prior allegation of sexual assault.* The defendant argues that exclusion of evidence of the victim's pre-1992 allegation of sexual assault, and the resultant immigration benefit that she received, violated his rights to confront the witnesses against him and his right to present a defense, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. He contends that the judge had no discretion to exclude all evidence of the victim's motive to lie at the time she first reported the rape to the defendant's mother, and that such error should be reviewed for a determination whether it was harmless beyond a reasonable doubt. The Commonwealth argues that the judge properly exercised his discretion in precluding cross-examination regarding a "remote incident that bore no relevance to the instant case," where the victim's voir dire testimony provided no factual basis for the defendant's asserted grounds of bias or motive to lie.

It is axiomatic that one of the primary interests secured by the confrontation clause of the Sixth Amendment is the right to cross-examine witnesses. *Davis* v. *Alaska,* 415 U.S. 308, 315 (1974), quoting *Douglas* v. *Alabama,* 380 U.S. 415, 418 (1965). That right "includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable." *Pennsylvania* v. *Ritchie,* 480 U.S. 39, 51-52 (1987). See *Commonwealth* v. *Ruffen,* 399 Mass. 811, 816 (1987) ("the Constitution requires that a defendant be permitted to introduce

---

[8]The victim denied discussing the immigration consequences of reporting a rape with any BARCC staff members. On cross-examination, the victim stated that she learned of the possibility of applying for a U-Visa from an attorney at the Victims' Rights Law Center (VRLC), and that procuring such a visa would allow her to remain lawfully in the United States during the pendency of the trial. She maintained that she had not understood at that time that obtaining a U-Visa ultimately could result in permanent residency status.

evidence which may materially affect the credibility of the victim's testimony'').

"The right is not absolute, however, and the judge has broad discretion to determine the scope and extent of cross-examination." *Commonwealth* v. *Johnson*, 431 Mass. 535, 538 (2000). A defendant must make a "plausible showing" of alleged bias, with a factual basis for support. *Commonwealth* v. *Tam Bui*, 419 Mass. 392, 401, cert. denied, 516 U.S. 861 (1995). "[T]he confrontation clause does not prevent the trial court from weighing the offer of proof to determine its probative value to the trier of fact and its probable effect on fair and efficient conduct of the trial." *Commonwealth* v. *Johnson*, *supra*, quoting *Chipman* v. *Mercer*, 628 F.2d 528, 531 (9th Cir. 1980). Particularly given the presumption that specific instances of a victim's sexual conduct are inadmissible, see G. L. c. 233, § 21B, disputed evidence must be "clearly relevant to a showing of bias or motive to lie" by the victim if it is to be admitted. *Commonwealth* v. *Joyce*, 382 Mass. 222, 232 (1981) (Hennessy, J., concurring). "If a defendant believes that the judge improperly restrained his cross-examination of a witness, the defendant must demonstrate that the judge abused his discretion and that he was prejudiced by such restraint." *Commonwealth* v. *Barnes*, 399 Mass. 385, 393 (1987), citing *Commonwealth* v. *Repoza*, 382 Mass. 119, 125-126 (1980).

Here, there was no such abuse of discretion. Although the defendant characterizes the judge's ruling as excluding all evidence of the victim's motive to lie, the judge permitted extensive inquiry into how the victim learned of her eligibility for a U-Visa, her knowledge of the visa's legal requirements and benefits, and the circumstances of her application. It is of little moment that the jury were not presented with evidence of the victim's state of mind when she made the first claim of rape to the defendant's mother. The defendant effectively elicited testimony that the victim was aware of the benefits of the U-Visa program before informing police of the rape, benefits for which she had applied at the time of trial. Such a report to police, rather than disclosure to a third party or counselling center, is a requirement for U-Visa eligibility. See 8 U.S.C. § 1101(a)(15)(U)(i)(III) (2012). Thus,

evidence of the victim's motive to lie was "sufficiently aired." *Commonwealth* v. *Avalos*, 454 Mass. 1, 8 (2009), quoting *Commonwealth* v. *LaVelle*, 414 Mass. 146, 154 (1993).

In any event, the defendant did not make the requisite showing that evidence of the victim's pre-1992 allegation of sexual assault clearly was relevant to a motive to lie. The victim's voir dire testimony regarding the circumstances of that incident was vague at best. She testified only that, at some point in the past, prior to 1992, she had received a temporary work authorization at a time when she was in therapy because "someone hurt [her]" in a sexual manner. She did not display an understanding of the legal basis for obtaining the work authorization, nor did she characterize the injury she sustained as rape or report it to the police. The defendant made no other offer of proof pertinent to the prior incident. Therefore, the judge properly determined that the probative value of any testimony concerning the prior incident of sexual assault would be outweighed by its prejudicial impact.

Moreover, further evidence of the victim's motive to lie by virtue of immigration considerations likely would have had little impact on the jury, where substantial other evidence, including the defendant's own statements, corroborated the victim's testimony. Cf. *Commonwealth* v. *LaVelle*, *supra* at 154-155 (even if evidence of witness's bias erroneously was excluded, defendant suffered no prejudice). A police officer testified that the defendant had recounted that he penetrated the victim after she had told him not to do so. The jury also heard the twenty-six voice messages left by the defendant on the victim's cellular telephone, which contained numerous incriminating statements regarding his actions on the night in question. Considerable evidence supported the jury's verdict.

b. *Denial of defendant's motions for production of BARCC records.* Before trial, the defendant filed a motion for production of counselling records from BARCC pertaining to the victim, pursuant to Mass. R. Crim. P. 17 (a) (2), 378 Mass. 885 (1979). A Superior Court judge ordered "stage I" production pursuant to *Commonwealth* v. *Bishop*, 416 Mass. 169, 181-183 (1993), and *Commonwealth* v. *Oliveira*, 438 Mass. 325, 332-334 (2002), then the governing protocol for production of records from third

parties.[9] After BARCC refused to comply, citing the attorney-client privilege, the defendant filed a motion seeking to apply the protocol established by *Dwyer, supra,* which recently had been decided.[10] The judge denied the motion, concluding that the case was inapplicable, since the attorney-client privilege has common-law origins, and *Dwyer* applies only to records covered by a statutory privilege.

Following his conviction, the defendant filed a motion for posttrial discovery pursuant to Mass. R. Crim. P. 30 (c) (4), as appearing in 435 Mass. 1501 (2001), again seeking production of the BARCC records.[11] The motion judge, who was also the trial judge, denied the motion, reaffirming the original decision on the pretrial motion on the use of the *Dwyer* protocol. The defendant's motion for a new trial, making substantially the same arguments, was also denied.

On appeal, the defendant argues that the attorney-client privilege protecting the BARCC records of the victim's counselling session should have been pierced in order to vindicate his constitutional rights to confrontation and to present a defense. He asks this court to extend the protocol established in *Dwyer, supra,* governing the production of statutorily privileged records from a third party, to the attorney-client privilege, a privilege rooted in the common law. The defendant contends that he should have been allowed access to the records before trial because he fulfilled his threshold obligation under *Commonwealth* v. *Lampron,* 441 Mass. 265 (2004) (*Lampron*), regarding the production of records from a third party, and that production was constitutionally compelled. He asserts that his posttrial motion should not have been denied for substantially the same

---

[9]This former procedure for the production of records from third parties often is referred to as the *"Bishop-Fuller* protocol." See *Commonwealth* v. *Labroad,* 466 Mass. 1037, 1039 (2014); *Commonwealth* v. *Pelosi,* 441 Mass. 257, 260 261 (2004); *Commonwealth* v. *Fuller,* 423 Mass. 216 (1996); *Commonwealth* v. *Bishop,* 416 Mass. 169 (1993).

[10]The judge's order regarding production of BARCC records, issued on February 15, 2006, predated *Commonwealth* v. *Dwyer,* 448 Mass. 122 (2006) (*Dwyer*), which was published on December 29, 2006. However, it postdated *Commonwealth* v. *Lampron,* 441 Mass. 265, 268 (2004) (relevancy requirements of Mass. R. Crim. P. 17 [a] [2], 378 Mass. 885 [1979], "must be satisfied before any documents of any kind may be summonsed from nonparties").

[11]At no time did the defendant seek production of records from the VRLC.

reasons, and also because the attorney-client privilege governing the records was waived during the course of trial.

The protocol set forth in *Dwyer, supra* at 145, applies where a defendant seeks pretrial inspection of statutorily privileged records of any third party.[12] The protocol "provides a reasonable opportunity for defense counsel . . . to inspect pretrial presumptively privileged records produced by a third party, subject to a stringent protective order." *Id.* However, to trigger use of the protocol, a defendant must first comply with the threshold requirements of Mass. R. Crim. P. 17 (a) (2), as elucidated in *Lampron, supra.* A defendant must

> "establish good cause, satisfied by a showing '(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition." ' "

*Id.* at 269, quoting *United States v. Nixon,* 418 U.S. 683, 699-700 (1974).

As we have emphasized, rule 17 (a) (2) is not a discovery tool to be "invoked merely for the exploration of potential evidence." *Lampron, supra.* Rather, its purpose is "to expedite trial proceedings and to avoid delays caused when counsel must inspect or examine documents or objects produced in response to a summons." *Commonwealth v. Mitchell,* 444 Mass. 786, 796-797 (2005). To that end, "[p]otential relevance and conclusory statements regarding relevance are insufficient" to meet the rule 17 standard. *Lampron, supra.*

---

[12]Because *Dwyer, supra* at 123, dealt with statutorily privileged records, we did not have occasion to consider the protocol that should apply to records covered by a common-law privilege such as the attorney-client privilege. Although we leave to another day the determination whether the *Dwyer* protocol should be extended to records covered by the attorney-client privilege, any such extension is not a foregone conclusion given the deep roots of that privilege in the common law and the purposes it serves. See *Suffolk Constr. Co. v. Division of Capital Asset Mgt.,* 449 Mass. 444, 448-449 (2007).

Here, we need not reach the defendant's claim that the *Dwyer* protocol should have been applied to pierce the attorney-client privilege protecting the BARCC records, because even the "stage I" motion for production of the BARCC records should not have been ordered. Neither the motion nor the supporting affidavit was sufficient to meet the defendant's initial burden of demonstrating the relevance of the records, where all of the allegations contained therein were couched in hypothetical language. The defendant argued, inter alia, that production was necessary because the records "could contain statements indicating the alleged victim felt with respect to the alleged incident that she and [the defendant] were 'both to blame,' " or "perhaps a previously alleged incident," and that "[t]he alleged victim likely discussed her state of mind" with the BARCC counsellor.

The defendant's allegations were thus "entirely speculative" and failed to "provide a factual basis for demonstrating that the privileged materials . . . were relevant and material to any issue in the case." *Commonwealth* v. *Bourgeois*, 68 Mass. App. Ct. 433, 437 (2007). Cf. *Commonwealth* v. *Labroad*, 466 Mass. 1037, 1039 (2014) ("Unlike in *Bourgeois*, [*supra*,] the defendant in this case alleged, with particularity, that the victim's psychological records contained specific information regarding her complaint of sexual assault"; psychologist's subsequent disclosure to police generated "specific information [that] made it clear that the victim discussed the report of sexual assault in some detail with the psychologist"). Significantly, the defendant did not point to any evidence demonstrating that the victim discussed with BARCC staff the immigration consequences of reporting a rape to the authorities, let alone "advance any specific, substantiated allegations concerning . . . [the victim's] bias or motive to lie." *Commonwealth* v. *Bourgeois*, *supra*. Instead, he relied only on a generalized claim that the victim could have fabricated her account of the rape. Such unsupported assertions do not meet the defendant's threshold burden under *Lampron*, and production of BARCC records should not have been ordered in the first instance.

There was no error in the denial of the defendant's posttrial motion for discovery of the BARCC records. Posttrial discovery may be authorized where affidavits filed by the moving party

"establish a prima facie case for relief." Mass. R. Crim. P. 30 (c) (4). "In requesting such discovery, the defendant must make a sufficient showing that the discovery is reasonably likely to uncover evidence that might warrant granting a new trial." *Commonwealth* v. *Daniels*, 445 Mass. 392, 407 (2005). Even with the benefit of the victim's trial testimony, the defendant made no such showing, instead relying primarily on the argument that disclosure was constitutionally compelled. And, indeed, there was scant trial testimony that could have been marshaled in support of such a showing. The victim denied discussing deportation concerns with BARCC staff; rather, she testified that she learned of her potential eligibility for the U-Visa from a VRLC attorney and that that person assisted her in filing an application. She did not testify, either in the presence of the jury or during voir dire, that she ever discussed the circumstances of the pre-1992 allegations of sexual assault and issuance of a temporary work authorization with staff of either BARCC or VRLC. The defendant's posttrial motion sought only relevant records from BARCC; at no time did he attempt to seek access to VRLC documents.

The defendant argues on appeal, as he did in his posttrial motion, that, in any event, the victim waived any privilege by testifying at trial to the contents of her communications with the BARCC attorney. However, "[i]t is only when a witness testifies to the specific details of an 'identified privileged communication' that a finding of waiver may result." *Commonwealth* v. *Clancy*, 402 Mass. 664, 668 (1988), quoting *Commonwealth* v. *Goldman*, 395 Mass. 495, 500, cert. denied, 474 U.S. 906 (1985). Although the victim testified to advice she received from a VRLC attorney to apply for a U-Visa, with regard to BARCC, she testified only that she went there because she "just needed to have somebody to talk to about what happened." She testified on cross-examination that she called on BARCC because she wanted to speak with someone about her legal rights and that she met with an attorney there. The victim in no way testified to specific details of privileged conversations and thus did not waive the attorney-client privilege.[13]

---

[13]The defendant argues for the first time on appeal that "[t]he Com-

Because we conclude that the defendant did not make the necessary threshold showing that he was entitled to production of BARCC records, we do not address the question whether, or in what circumstances, the *Dwyer* protocol could be applied to pierce the attorney-client privilege.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*

---

monwealth's insertion [of the victim's] conversation with [the BARCC attorney] into the case as a rebuttal to [the] defense" also supports a finding of waiver. We generally do not consider arguments on appeal that were not raised previously. See, e.g., *Carey* v. *New England Organ Bank*, 446 Mass. 270, 285 (2006). In any event, this argument fails because the Commonwealth cannot waive the attorney-client privilege on the victim's behalf. See *Matter of a John Doe Grand Jury Investigation*, 408 Mass. 480, 483 (1990) (attorney-client privilege belongs only to client and therefore can be waived only by client).