NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1216                                           Appeals Court

COMMONWEALTH  vs.  HERVE OLIVIER, JR.


No. 13-P-1216.

Middlesex.     October 7, 2015. - August 10, 2016.

Present:  Katzmann, Rubin, & Wolohojian, JJ.


Rape.  Practice, Criminal, Indictment, Lesser included offense,
     Sentence, Subpoena, Argument by prosecutor, Jury and
     jurors, Voir dire.  Subpoena.  Evidence, Relevancy and
     materiality, Privileged record, Expert opinion.  Search and
     Seizure, Warrant, Affidavit.  Witness, Expert.




     Indictments found and returned in the Superior Court
Department on December 15, 2011.

     A pretrial motion for presumptively privileged records was
considered by Thomas P. Billings, J., and a renewed motion was
heard by Kathe M. Tuttman, J; a pretrial motion for a hearing on
the adequacy of the affidavit supporting a search warrant was
heard by Thomas P. Billings, J.; and the cases were tried before
Bruce R. Henry, J.


     Stanley D. Helinski for the defendant.
     Kate Cimini, Assistant District Attorney, for the
Commonwealth.


     RUBIN, J.  This case presents a question of first

impression about the adequacy of the subsequent offense portion

of an indictment where, on the main indictment, a defendant is convicted not of the charged offense, but of a lesser included offense that carries a subsequent offense enhancement.

The defendant was indicted on December 15, 2011, on ten counts. Count 1 charged rape of a child by force under G. L. c. 265, § 22A. A second part of that count, captioned "Forcible Rape of a Child -- Subsequent Offense," charged that at the time of the offense charged in the first count the defendant "was previously convicted of Indecent Assault and Battery on a Child Over Fourteen, a violation of Massachusetts General Laws Chapter 265 Section 13[H] in the Framingham Juvenile Court Docket No. DL05FO606 on November 28, 2007."[1] See G. L. c. 265, § 22C.[2]

---

[1] The subsequent offense portion of count 1 of the indictment originally contained a typographical error, listing the statutory section for the previous conviction of indecent assault and battery on a person over fourteen as "[G. L. c.] 265, [§] 13B." This error was corrected prior to the trial on that part of count 1. The defendant does not argue on appeal that the judge erred by allowing the Commonwealth to amend the indictment.

[2] The original subsequent offense portion of count 1 also erroneously listed the statutory section for that offense as "C.265, § 23C." The statutory section providing for a subsequent offense enhancement for rape of a child by force is G. L. c. 265, § 22C. The statutory section providing for a subsequent offense enhancement for statutory rape is G. L. c. 265, § 23B. The Commonwealth was permitted to amend the section number to "23B" immediately before the trial on the subsequent offense portion of the indictment. The defendant does not argue on appeal that the judge erred by allowing this amendment.

After a jury trial, the defendant was convicted on count 1 not of rape of a child by force, but of the lesser included offense of rape of a child (i.e., statutory rape) under G. L. c. 265, § 23.  Some eleven days later, a new jury was empanelled, and the defendant was tried on the subsequent offense penalty enhancement for the latter crime under G. L. c. 265, § 23B.  See G. L. c. 278, § 11A; Commonwealth v. Pelletier, 449 Mass. 392, 396 (2007), quoting from Commonwealth v. Miranda, 441 Mass. 783, 788 (2004) (explaining that § 11A "requires a defendant to be tried in a two-step, bifurcated procedure:  'first, on the underlying substantive crime and, then, in a separate proceeding, on that component of the charge referring to the crime as a second or subsequent offense'").  See also Commonwealth v. Fernandes, 430 Mass. 517, 520-521 (1999), cert. denied sub nom. Martinez v. Massachusetts, 530 U.S. 1281 (2000) ("[T]he counts for the current offense and for the repeat offense are viewed as parts of one indictment and charge only one crime with a sentence enhancement provision").  He was convicted.  He received a mandatory minimum sentence of fifteen years in State prison under the penalty enhancement.[3]  See G. L. c. 265, § 23B.  The defendant now appeals.

---

[3] The defendant was also sentenced to (1) community parole supervision for life pursuant to G. L. c. 265, § 45, on count 1; (2) a consecutive term of five years of probation on count 2, a

1.  The subsequent offense enhancement.  The defendant first argues that since he was acquitted of rape of a child by force on count 1, the subsequent offense portion of the indictment was in essence a nullity.  The indictment read "Forcible Rape of a Child -- Subsequent Offense."  Since the defendant was acquitted of forcible rape of a child under the first count, the defendant argues, if the Commonwealth desired to try him for the subsequent offense enhancement applicable to the lesser offense of which he was convicted, it was required to amend the indictment to say so.  He argues that having failed to do so, the Commonwealth did not put him on notice that he might be tried for the subsequent offense enhancement were he convicted of a lesser included offense.[4]

We disagree.  It is well established that an indictment for a greater offense puts a defendant on notice that he may be convicted of a lesser included offense that is not named in the

_____

second count of statutory rape for which the Commonwealth did not seek a subsequent offender enhancement; and (3) 337 days in the house of correction, deemed served, on counts 6 and 7, two drug offenses to which he pleaded guilty.

[4] Because the relevant question is whether the defendant was put on notice at the time of the original indictment of what might follow from conviction of a lesser included offense, the judge's amendment immediately before commencement of the subsequent offense portion of the trial of the statutory citation, but not the language of the indictment, is irrelevant to our opinion, even if such a change were otherwise sufficient to cure the alleged notice problem, something we need not and do not decide.

indictment.  See Commonwealth v. Keane, 41 Mass. App. Ct. 656, 661 (1996) ("[A]n indictment for aggravated rape clearly gives notice of the lesser included crime of rape").  Likewise, the second or subsequent offense portion of an indictment identifies the previous conviction[5] that the Commonwealth will seek to prove at trial.  In such a case, we think that the subsequent offense indictment puts a defendant on notice that, should he be convicted of only a lesser included offense for which the prior conviction named in the subsequent offense indictment also subjects him to a subsequent offense enhancement, the Commonwealth may proceed to trial on the subsequent offense enhancement applicable to the lesser included offense conviction.

First, we think that this is the way that any reasonable attorney would understand the indictment, though we recognize that how any individual attorney would understand the language of the indictment is an empirical question.  Second, we think that any alternative would be impractical, since the second, subsequent offense trial is ordinarily conducted immediately

---

[5] In this case, the previous "conviction" was in fact an adjudication of delinquency, since the defendant was fourteen years old when he committed the prior offense of indecent assault and battery on a person fourteen or older.  As the subsequent offense statute for statutory rape provides the same sentencing enhancement for both prior convictions and prior adjudications of delinquency, the distinction is immaterial. See G. L. c. 265, § 23B.

after the conviction on the underlying offense. And finally, such a reading of the indictment does not prejudice the defendant. No defendant can be certain of a conviction on a lesser included offense rather than the charged offense. Therefore, if the prior conviction is to be contested, counsel will have to prepare for the subsequent offense trial in advance of trial on the charged offense. In circumstances such as these, where the specific prior offense to be proved is identified in the indictment and it subjects the defendant to an enhancement with respect to the lesser included offense of conviction, nothing different will be at issue in the subsequent offense trial than would have been at issue had the defendant been convicted of the charged, greater offense. There thus can be no prejudice to the defendant.

We note that nothing that we say prevents the Commonwealth from determining not to proceed on a subsequent offense enhancement in the event of conviction of only a lesser included offense. That discretionary determination remains with the executive branch. See, e.g., District Attorney for the Suffolk Dist. v. Watson, 381 Mass. 648, 668 (1980) (prosecutor has uncurbed discretion to nol pros portions of indictment charging murder in first degree). We also note that our decision applies only to indictments such as the one at issue here, which identifies the prior conviction to be proved. We express no

opinion on indictments that may be phrased or structured differently.

2. The remaining claims of error. The defendant also claims that the Superior Court judges erred in five other respects: (1) by denying the defendant's motions seeking the victim's records; (2) by denying the defendant's motion for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978); (3) by ruling that the defendant's deoxyribonucleic acid (DNA) expert could not criticize the thoroughness of the Commonwealth's investigation; (4) by failing to sustain the defendant's objection to the prosecutor's misstatements in closing; and (5) by refusing to ask a series of voir dire questions proposed by the defendant. We disagree with the defendant in all respects. Before explaining our reasoning, however, it is necessary to set forth additional factual background.

a. Background. As stated previously, the defendant was indicted on ten counts: two counts of rape of a child by force as a subsequent offense, G. L. c. 265, § 22A; two counts of aggravated rape of a child by force (aggravated by kidnapping) as a subsequent offense, G. L. c. 265, § 22B; one count of indecent assault and battery on a person over fourteen, G. L. c. 265, § 13H; one count of distribution of marijuana, G. L. c. 94C, § 32C(a); one count of possession with intent to distribute

marijuana, G. L. c. 94C, § 32C(a); one count of kidnapping, G.
L. c. 265, § 26; one count of intimidation of a witness, G. L.
c. 268, § 13B; and one count of threat to commit a crime, G. L.
c. 275, §§ 2 & 4.  The defendant pleaded guilty to the drug
offenses before trial.  He was found guilty of the lesser
included offense of statutory rape on the four indictments that
charged rape of a child by force and aggravated rape.  The judge
then vacated the jury verdicts on the aggravated rape charges
and dismissed the indictments as duplicative.  The defendant was
acquitted of indecent assault and battery, kidnapping,
intimidation of a witness, and threat to commit a crime.  As
discussed above, in the second phase of the trial, a new jury
found that the conviction of rape of a child on count 1 was a
subsequent offense.

We recite the facts a reasonable jury could have found,
taking the evidence in the light most favorable to the
Commonwealth except where the jury verdicts rejected the
Commonwealth's theory of the case.  We reserve additional facts
for later discussion of specific issues.

The defendant and the victim started communicating in
October, 2011, when the victim had returned to her grandparents'
house[6] in New Hampshire after running away to stay with friends

_____

[6] The victim's grandparents were her legal guardians.

in Marlborough for three days.  The victim used two different applications installed on her iPod Touch to communicate with the defendant both by voice and by text message.  At some point during the next few weeks, the victim told the defendant that she wanted to run away again.

On November 1, 2011, they made a plan for the defendant and a friend of his, who had a car, to pick up the victim at her grandparents' house.  When the defendant sent a text message saying that he was nearby, the victim told her grandmother that the screen in her window was broken.  While her grandmother was looking at the screen, the victim took her purse, a bag she had packed, and thirty-seven dollars from her grandmother's purse, and left the house.  Before she got into the car with the defendant, he said that she should tell his friend she was nineteen.  However, at the time she was only fifteen.  The victim's grandmother saw her getting into the car, yelled at her to stop, and then got in her car and gave chase until she could no longer see the vehicle she was pursuing.[7]

The defendant's friend drove to the defendant's house in Maynard, where he dropped off the defendant and the victim.  On the night of November 2 and the morning of November 3, the

_____

[7] The victim testified that she tried to get out of the car, but the defendant threatened to kill her if she did.  The jury's verdict on the threat to commit a crime charge indicates that they did not find beyond a reasonable doubt that this occurred.

defendant and the victim had sex.[8] The victim testified that the first time they were on the defendant's bed and the second time they were on the defendant's floor. The victim did not know whether the defendant used a condom the first time, but testified that the second time he did use a condom, which he took from the top drawer of his dresser.

Later on November 3, the victim sent a text message to a friend of hers asking him to pick her up. When he arrived, she left without her iPod or her purse because the defendant had taken them. They drove to a location where the victim's grandparents could pick her up.

The grandparents then brought the victim to their town police station, where they had reported her missing. A detective interviewed the victim. During that initial interview, she denied that there was a sexual relationship between her and the defendant. After she gave her statement, the detective told her that he was not sure she was being truthful. On November 7, the victim's grandmother called the police station, and told the detective that there had been sexual contact between the victim and the defendant. On the basis of this new information, the Maynard police sought,

---

[8] The victim testified that both instances were not consensual and were forcible. The jury's verdicts indicate that they did not find this to be the case beyond a reasonable doubt.

received, and executed a search warrant for the defendant's house on November 8. The police seized, among other things, the victim's purse and the sheets and blankets from the defendant's bed.

b. The defendant's rule 17(a)(2) motions. The defendant argues that the motion judges should have allowed his motions under Mass.R.Crim.P. 17(a)(2), 378 Mass. 885 (1979), for third-party subpoenas of the victim's medical records, § 504(b) records,[9] and school records under the protocol set forth in Commonwealth v. Dwyer, 448 Mass. 122 (2006) (Dwyer).

Prior to trial, the defendant acquired a letter that was addressed to the victim's primary care provider from a doctor who had interviewed the victim after she reported the alleged rape.[10] This letter contains three facts relevant to the issues raised on appeal. First, the letter indicates that the victim saw a counsellor because of posttraumatic stress disorder (PTSD) and that the victim's grandmother stated that this condition resulted from the victim's stepfather locking her out of the house one night. Second, the letter indicates that the victim

---

[9] See note 11, infra.

[10] The letter itself makes clear that the recipient, Amanda Woodfriend, is the victim's primary care provider, as it states, "Apparently [the victim] will now be seeing you for primary care." At the motion hearing, counsel for the defendant incorrectly suggested that Woodfriend was the victim's counsellor.

told the interviewing doctor that she was planning on informing her counsellor about the alleged rape during an appointment the following week. Third, the letter indicates that the victim has a 504 plan[11] at her high school because of her PTSD.

On June 2, 2012, the defendant filed a motion requesting "[a]ll treatment records and interviews" from the interviewing doctor and the victim's primary care provider, records relating to legal guardianship and legal custody proceedings involving the victim, and records relating to the victim's 504 plan. The first motion judge denied this motion after a nonevidentiary hearing on June 4, 2012, essentially on the ground of relevance.[12] On May 3, 2012, the defendant had filed a motion requesting "all records" of the victim from her high school.[13]

_____

[11] Although the letter does not explain this terminology, a "504 plan" is a plan "to accommodate [a child's] disability and enable [her] to attend public school." CTL v. Ashland Sch. Dist., 743 F.3d 524, 525 (7th Cir. 2014). Public schools are required by § 504 of the Rehabilitation Act, 29 U.S.C. § 794 (2012), to provide such plans to ensure that individuals with disabilities are not subjected to discrimination on account of their disabilities. See C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 831, 840-841 (2d Cir. 2014).

[12] On July 19, 2012, the defendant renewed the portion of the June 2 motion that requested records from the interview and medical evaluation performed after the victim had reported the alleged rape. The second motion judge allowed this motion the same day. The court received the records a little over a month later.

[13] The docket does not reflect the filing of this motion on May 3, 2012. However, both the defendant's record appendix and

After the first motion judge denied this request without prejudice, the defendant renewed the motion on July 19, 2012. The second motion judge denied the renewed motion "without prejudice to renew upon a further showing of evidentiary relevance pursuant to Mass.R.Crim.P. 17."  The defendant did not renew the motion a second time.

The defendant appeals from the denial of his motions for third-party subpoenas of the medical records, the records relating to the victim's 504 plan, and the victim's school records.  Evaluating the defendant's arguments requires applying the Dwyer protocol.

Dwyer, 448 Mass. at 147-150 (Appendix), established a multi-step protocol that a defendant must follow to gain access to presumptively privileged records held by a nonparty via a rule 17(a)(2) motion.  The Dwyer protocol replaced the restrictive Bishop-Fuller protocol that had previously governed such motions.  See Dwyer, supra at 144 ("[A]mong the most significant difficulties [with the Bishop-Fuller protocol] is the inability of defendants to meet the stringent Fuller standard, even though statutorily privileged records may contain exculpatory evidence").  See also Commonwealth v. Bishop, 416

the Commonwealth's supplemental record appendix include a copy of the motion dated May 3, 2012, bearing a handwritten, signed denial by the first motion judge.

Mass. 169 (1993); Commonwealth v. Fuller, 423 Mass. 216 (1996).
The Dwyer protocol relaxes Fuller's more stringent requirements.
See Dwyer, supra at 144 ("The amended protocol is designed to
give the fullest possible effect to legislatively enacted
privileges consistent with a defendant's right to a fair trial
that is not irreparably prejudiced by a court-imposed
requirement all but impossible to satisfy").

The first step of the Dwyer protocol -- which applies to
requests for both privileged and nonprivileged records --
requires the defendant to file and serve a motion pursuant to
Mass.R.Crim.P. 17(a)(2).[14]  Dwyer, 448 Mass. at 147 (Appendix).
Under Commonwealth v. Lampron, 441 Mass. 265 (2004) (Lampron),
"[T]he party moving to subpoena documents to be produced before
trial must establish good cause, satisfied by a showing '(1)
that the documents are evidentiary and relevant; (2) that they
are not otherwise procurable reasonably in advance of trial by
exercise of due diligence; (3) that the party cannot properly
prepare for trial without such production and inspection in

---

[14] The Commonwealth is required to forward copies of the
motion and the attached affidavit to the record holder and the
victim, and to inform both the record holder and the victim that
they may be heard at the Lampron hearing "on whether the records
sought are relevant or statutorily privileged."  Dwyer, 448
Mass. at 148 (Appendix).  The defendant has not argued that the
Commonwealth failed to satisfy this requirement of the Dwyer
protocol, so we assume that it was followed in this case, and
that the record holder and the victim chose not to appear at the
Lampron hearing.

advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."'" Id. at 269, quoting from United States v. Nixon, 418 U.S. 683, 669-700 (1974). The judge is to determine whether the requested records are privileged only after first ruling on whether the defendant has satisfied the four prongs of the Lampron standard. See Dwyer, supra at 148 (Appendix).

i. The medical records. As to the medical records, the first motion judge correctly determined that the defendant failed to meet the first prong of this test for good cause. Under this prong "the defendant must 'make a factual showing that the documents sought are relevant and have evidentiary value'[;] . . . '[p]otential relevance and conclusory statements regarding relevance are insufficient . . . .'" Dwyer, supra at 142, quoting from Lampron, supra at 269. The standard of relevance applied to rule 17(a)(2) motions is the same standard applied to evidence at trial: "the defendant must show that the documentary evidence sought has a 'rational tendency to prove [or disprove] an issue in the case.'" Lampron, supra at 269-270, quoting from Commonwealth v. Fayerweather, 406 Mass. 78, 83 (1989). This standard -- rather than the broad discovery standard -- applies because "rule 17(a)(2) is not a discovery

tool." Dwyer, supra at 142 (emphasis omitted). Thus, allegations of relevance "couched in hypothetical language" are insufficient. Commonwealth v. Sealy, 467 Mass. 617, 628 (2014) (Sealy). That said, in evaluating arguments for relevance under the first prong of Dwyer, the court must be sensitive to the fact that the defendant necessarily lacks access to the content of the requested records. Requiring too much specificity from the defendant risks resurrecting the restrictive Bishop-Fuller protocol in another guise. However, requiring too little specificity risks making the privileged medical records of crime victims an open book.

The defendant makes three arguments for the relevance of the victim's medical records. First, the defendant argues that records of the victim's PTSD diagnosis might establish that she suffers from dissociation, which could have caused her to misperceive the events of the alleged rapes. Second, the defendant argues that because the PTSD allegedly resulted from the victim's stepfather once punishing her by locking her out of the house overnight, records of the victim's PTSD diagnosis might establish that the victim has a particularly strong motive to lie to avoid punishment by her current guardians. Third, the defendant argues that records from the victim's appointment with her therapist after the alleged rapes might contain either an inconsistent account or meaningful silence.

As to the first claimed justification, the defendant has not provided any evidence that PTSD can cause a person to misperceive events that bear no relationship to the traumatic event that caused the PTSD. The defendant's expert does not make such a statement and the source cited by the defendant's expert does not support it. See Feeny & Danielson, PTSD, Dissociation, and Treatment, in Advances in the Treatment of Posttraumatic Stress Disorder: Cognitive-Behavioral Perspectives 223, 225-227 (Steven Taylor ed., 2004) (defining "dissociation").

As to the second, the defendant has provided no evidence that people who suffer from PTSD have a stronger motive to lie to avoid trauma-related events such as punishment than do other people who do not suffer from PTSD. The affidavit of the defendant's expert does not support this proposition.

Finally, as to the third asserted basis for the relevance of the requested material, even assuming that the primary care provider whose records the defendant sought would for some reason have information in her records about statements the victim made to her counsellor, there is no evidence the victim ever even spoke to her counsellor about the alleged rape. There is only a note in the letter to the victim's primary care provider stating that the doctor who wrote the letter urged the victim to speak to her counsellor about the incident. This

final basis for the request thus is "'entirely speculative,' [and the defendant has] failed to 'provide a factual basis for demonstrating that the privileged materials . . . were relevant and material to any issue in the case.'" Sealy, 467 Mass. at 628, quoting from Commonwealth v. Bourgeois, 68 Mass. App. Ct. 433, 437 (2007).

ii. The 504(b) records. The defendant's argument for the relevance of the 504 plan records held by the victim's school is also, as the first motion judge concluded, unavailing. The defendant claims that these records would contain evidence of the victim's "mental state at the time of the incident." The defendant's motion, however, requested "[r]ecords relating to the alleged victim's '504 Plan' including basis of enrollment." The defendant offered no reason to believe that records relating to the victim's initial enrollment in the 504 plan would be relevant to her mental state at the time of the alleged rape. The defendant also offered no evidence that the school's records contain any information other than the bare fact that the victim suffers from PTSD. In the absence of a proffer of any basis for believing the records contained the information described, the defendant's claim of relevance with respect to the 504 plan records is speculative as well.

Because we affirm the denial of this Lampron motion on relevance grounds, the defendant's argument that the victim

waived her privilege over her medical records is moot. As stated above, Lampron requires that the requested documents be relevant whether or not they are privileged. 441 Mass. at 269.

iii. The school records. Lastly, as to the requests for all the victim's high school records, we also agree with both motion judges that the defendant failed to make a showing of relevance sufficient to warrant the issuance of a third-party subpoena.

The defendant argues that the requested school records were relevant because the victim "must have provided some explanation to the school for her absence" while she was with the defendant. As in Sealy, this claim of relevance is utterly speculative, and is therefore insufficient. See Sealy, 467 Mass. at 628. And, as above, the defendant's argument that the victim waived the privilege as to her school records is moot.

c. The defendant's Franks motion. Next, the defendant argues that the first motion judge should have allowed his motion for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). A search of the defendant's home was conducted pursuant to a search warrant after the victim told a police officer that while she was at the defendant's house he had raped her on two separate occasions, that the defendant had used a condom on one of those two occasions, and that the defendant had stolen several of her possessions. The defendant argues that

the magistrate who issued the warrant was not provided with additional information -- specifically, that the victim had a history of running away from the house where she lived with her grandparents, that she had tricked her grandmother in order to get out of the house and into the car with the defendant, that she had stolen money from her grandmother before leaving, that during her initial interview with the police she denied any sexual relationship between her and the defendant, that the officer who conducted the initial interview said that he did not think she was being truthful, and that she first made the allegation of rape to the police four days after that initial interview.  He argues that he has made a "substantial preliminary showing" that the affidavit accompanying the application for the search warrant "contained one or more [omissions of fact] made intentionally or with reckless disregard for the truth" that were material to the magistrate's finding of probable cause, see Commonwealth v. Ramos, 72 Mass. App. Ct. 773, 777 (2008), and that therefore the motion judge should have held a hearing under Franks.

We disagree.  Because this additional information would not have eliminated probable cause, there was no need for such a hearing.  Cf. Commonwealth v. Amral, 407 Mass. 511, 519-520 (1990), quoting from Franks, 438 U.S. at 155-156 (where the affidavit supporting the warrant application allegedly contained

false statements, suppression would be the remedy only if "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause").

d. <u>The defendant's DNA expert</u>. The defendant argues next that his DNA expert should have been permitted to criticize the thoroughness of the investigation done in this case by testifying that bed sheets taken from the defendant's house during the search should have been tested for DNA.

The expert, however, held expertise in observing DNA testing in laboratories, ensuring that the testing was exhaustive, and advising defense attorneys as to whether the testing was performed in accordance with the laboratory's procedures and protocols. During both pretrial proceedings and at trial, defense counsel acknowledged that the witness's expertise was so limited, stating that he is "not a criminologist," and agreeing with the judge that the expert was not involved in the collection of DNA evidence, but instead was an expert in analyzing samples that somebody else had collected.

Expert witnesses are not permitted to testify to matters outside their area of competence. Thus, the trial judge did not abuse his discretion in preventing the expert from criticizing the thoroughness of the Commonwealth's investigation. See <u>Commonwealth</u> v. <u>Frangipane</u>, 433 Mass. 527, 533 (2001).

e. The prosecutor's closing statement. The defendant argues that the prosecutor misstated the evidence during her closing statement. During the closing, the prosecutor described the police search of the defendant's bedroom, saying that "in the top bureau drawer right where [the victim] said the defendant had reached to get a condom they found a big bag of condoms and the ripped opened wrapper." The defendant argues that the use of the definite article -- "the ripped opened wrapper" -- implied that there was evidence that the condom wrapper found had contained the condom used with the victim, when, in fact, the prosecutor's statement required drawing an inference from the evidence. The defendant objected below. The trial judge agreed to instruct the jury that final arguments "are just that, arguments," and that the jurors' recollection of the facts controls, but said that he did not hear any improper argument.

We see no error. There was evidence that the defendant had used a condom with the victim and that he had taken the condom out of a bureau drawer where police found a condom wrapper during the search of the defendant's room five days later. The prosecutor's closing is best read permissibly to marshal the evidence and to draw reasonable inferences therefrom in an attempt to make a case to the jury. Commonwealth v. Hart, 428

Mass. 614, 616 (1999) (prosecutor's closing argument may contain "inference[s] from the evidence").

f. The defendant's proposed voir dire questions. Finally, the defendant proposed a series of voir dire questions designed, he argues, to assess prospective jurors' racial prejudice. The defendant is correct that in cases involving interracial rape, "individual questioning with respect to racial prejudice, on request, is mandatory." See Commonwealth v. Lopes, 440 Mass. 731, 737 (2004). The precise questions to be asked at voir dire, however, are within the sound discretion of the trial judge. See Commonwealth v. Pope, 392 Mass. 493, 505 (1984). Here, the judge asked each prospective juror a question in roughly the form: "The complaining witness in this case is white, the defendant is black. Would those facts affect you in any way in listening to this case?" He also told defense counsel before the voir dire began that "if you have some feeling about a particular juror and you'd like me to ask some further questions of a particular juror, I will at least entertain that and probably do that under the circumstances." We think that this was an appropriate and adequate mechanism for addressing the issue raised by the defendant, and we see no abuse of discretion in the judge's refusal to routinely ask

every prospective juror the additional questions propounded by the defendant.

<u>Judgments affirmed</u>.