NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-10986

COMMONWEALTH vs. FREDYS ALEXANDER CHICAS.

Suffolk.    November 9, 2018. - January 30, 2019.

Present: Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.

Homicide. Constitutional Law, Confrontation of witnesses. Evidence, Cross-examination. Due Process of Law, Interpreter. Practice, Criminal, Confrontation of witnesses, Interpreter, Capital case.

Indictment found and returned in the Superior Court Department on March 28, 2006.

The case was tried before Margaret R. Hinkle, J., and a motion for a new trial, filed on May 15, 2015, was considered by Christine M. Roach, J.

Janet H. Pumphrey for the defendant.
Teresa K. Anderson, Assistant District Attorney, for the Commonwealth.

CYPHER, J.  A jury convicted the defendant, Fredys Alexander Chicas, of murder in the first degree by extreme atrocity or cruelty as a joint venturer for the killing of the victim.  We consolidated the defendant's direct appeal with his

appeal from the denial of his motion for a new trial.  On appeal, the defendant contends that (1) he was denied his constitutional right to confront witnesses when the judge prohibited him from cross-examining several of the Commonwealth's witnesses on their citizenship statuses; and (2) the use of multiple interpreters by the judge violated his constitutional right to due process.

For the reasons stated infra, we affirm the defendant's conviction and the denial of the defendant's motion for a new trial.  After a thorough review of the record, we also decline to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or to reduce the verdict of murder in the first degree.

1.  Background.  We summarize the facts that the jury could have found, reserving pertinent facts for the discussion of the defendant's arguments.  On Christmas Eve in 2005, the victim and the defendant attended a party at Jose Castillo's house in Chelsea.  At some point in the evening, the victim, who was intoxicated, made inappropriate comments to the defendant's girl friend, Catea Travassas, and her sister, Lisette Santos.  The victim also touched Travassas's buttocks.  The defendant

intervened and implored the victim not to disrespect Travassas.[1] Eventually, tempers boiled over and the defendant punched the victim in the face.  The fight escalated and other partygoers got involved, including the defendant's coventurer, Jesus Villanueva.  The men brought the victim outside the house, where they hit him with bottles of beer.

After the fight, the victim ran away.  He returned a short time later looking for his cellular telephone.  He was not allowed back into the house, and a few men, including the defendant, went outside and began to kick the victim.  As a result, the victim left and returned again.  He started smashing Castillo's vehicle with rocks, a bottle, and a stick.  The defendant and Villanueva confronted the victim.  The defendant was armed with a baseball bat.  The defendant beat the victim with the bat, and Villanueva kicked him.  The victim ran away, but the defendant and Villanueva pursued him.  The men caught the victim in a parking lot that was one and one-half blocks away.  The defendant and Villanueva beat him with the bat and a stick then "left [him] . . . [a]ll bloodied on the ground."

Approximately ten to fifteen minutes later, the defendant and Villanueva returned to the party with blood on their

---

[1] There was evidence that the victim and the defendant were arguing because the victim owed the defendant money or stole forty dollars from him.

clothing.  Castillo gave the defendant clean clothes and told him to change.  The defendant stated:  "I killed him"; "[w]e killed [him]"; and "don't talk about this."  When Santos started crying, the defendant responded, "You don't have to be crying for that mother fucker."

After he changed his clothes, the defendant, Villanueva, the sisters, and another partygoer, Ricardo Mendoza, left the party.  On the way to Mendoza's house, the defendant stopped his vehicle underneath a nearby bridge to retrieve the baseball bat used against the victim.  The defendant was concerned that his fingerprints were on the bat.  The defendant gave the bat to Mendoza and told him to hide it at his residence.  The defendant threatened Santos, telling her that he would run her over if she told the police what had happened.

The defendant and Villanueva then returned to the parking lot.  Upon arriving, the men realized that the victim was alive.  The victim was speaking and moving.  For the next ten minutes, the defendant hit the victim on the back and Villanueva hit him on the head.  The defendant later told Santos that, "We [had] to kill him so he [would] not say anything."

The next morning, Santos witnessed Villanueva burning a wooden stick.  Villanueva claimed that the stick had blood on it.  Villanueva packed a bag of his belongings, and the defendant picked him up and took him to the bus station.

Villanueva said that he was going to San Francisco and then returning to his native El Salvador. Although Villanueva was indicted for murder, he has not been seen since he left for San Francisco.

A few days later, the defendant, Travassas, Santos, and her boyfriend fled to New Jersey. During the trip, the defendant reiterated his threat to the group that no one should talk to the police or the same thing that happened to the victim would happen to them.

Two weeks later, the defendant turned himself in to the police. He told the others that he would tell the police that Villanueva killed the victim.

2. Discussion. a. Confrontation rights. In his direct appeal, the defendant contends that the judge violated his right to confrontation by limiting the cross-examination of several of the Commonwealth's witnesses. He argues that because a defendant is entitled to a reasonable cross-examination of a prosecution witness for the purpose of showing bias, the judge abused her discretion by precluding him from inquiring about the citizenship or immigration status of certain witnesses. The Commonwealth asserts that the judge properly exercised her discretion in limiting cross-examination because the citizenship or immigration status of the witnesses was not relevant. We review the judge's decision to limit the defendant's cross-

examination for an abuse of discretion.  See Commonwealth v. McGhee, 472 Mass. 405, 426 (2015).

The Commonwealth anticipated that six or seven of its witnesses would be undocumented immigrants.  The Commonwealth disclosed that during trial preparation, a detective told one of those witnesses that the detective would be willing to write him a letter if he decided to apply for United States citizenship in the future.  At trial, the defendant sought to ask all of the Commonwealth's witnesses whether they were citizens of the United States in an attempt to put forth the inference that they were undocumented and, because they were undocumented, they may be inclined to cooperate with the Commonwealth.  When defense counsel began to cross-examine the first such witness, he asked whether the witness was a citizen of the United States.  The Commonwealth objected, and the judge sustained the objection. During a sidebar discussion, the judge ruled that she would permit the defendant to probe a witness's citizenship status "in any instance where [he knew or had a good faith basis in believing that] there ha[d] been any discussion with any member of law enforcement about [the witness's] citizenship status." The judge allowed the defendant to explore "any conceivable bias" by asking whether a witness had "ever had any discussion with any of the police officers or the prosecutors in this case about [his or] her citizenship status."  If the witness answered

yes, and established a foundation for further inquiry, the judge would decide how much further the defendant would be permitted to explore.

The judge noted that the defendant did not have any legal authority to support his position that he should be allowed to question whether a witness was an undocumented immigrant on cross-examination. She concluded:

> "[T]his is not a case where there is any evidence at all that any of these witnesses are testifying voluntarily for the Commonwealth. In other words, there is no potential hint here of an effort to curry favor from the Commonwealth; to the contrary. The record reflects, based on what I know pretrial, that there was an unwillingness -- I don't want to overstate this, but that there was an unwillingness on the part of the illegal aliens to cooperate with the government and testify, which seems to me to be logical. . . . So, again, my decision is grounded on the fact there is no controlling authority at the appellate level in the Commonwealth and the fact that in my view, the relevance, in terms of bias, is only tenuous; it's marginal, and that permitting that inquiry would be outweighed by the potentially harassing nature of this in terms of the witnesses."

The Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights entitle a defendant to cross-examine prosecution witnesses for bias or prejudice. Commonwealth v. Avalos, 454 Mass. 1, 6-7 (2009), citing Commonwealth v. Allison, 434 Mass. 670, 681 (2001). A judge may not "bar all inquiry into the subject" if the defendant demonstrates "a possibility" of bias. Commonwealth v. Magadini, 474 Mass. 593, 604 (2016), quoting Commonwealth v. Tam

Bui, 419 Mass. 392, 400, cert. denied, 516 U.S. 861 (1995). The right to cross-examination, however, "is not without limits, and it 'must be accommodated to other legitimate interests.'" Commonwealth v. Johnson, 431 Mass. 535, 540 (2000), quoting Commonwealth v. Clifford, 374 Mass. 293, 305 (1978). Those limits are "based on concerns about . . . harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant" (citation omitted). Johnson, supra. Moreover, a judge has discretion to limit questions that involve collateral issues and questions where the connection to the evidence of bias is too speculative. Avalos, supra at 7. "A defendant must make a 'plausible showing' of alleged bias, with a factual basis for support"; otherwise, the judge may restrict or entirely exclude the inquiry. Commonwealth v. Sealy, 467 Mass. 617, 624 (2014), quoting Tam Bui, supra at 401. The judge has broad discretion to determine the scope and extent of cross-examination. See Commonwealth v. Jones, 478 Mass. 65, 73 (2017); Commonwealth v. Meas, 467 Mass. 434, 450, cert. denied, 135 S. Ct. 150 (2014).

The defendant asks this court to hold that a witness's status as an undocumented immigrant impugns that witness's credibility -- even without the specifically articulated expectation of favorable treatment with respect to his or her citizenship status. The defendant contends that he should be

able to draw out a witness's citizenship status on cross-examination to explore bias. We conclude that this argument depends on a showing that the witness was testifying in order to curry favor with the Commonwealth. See Meas, 467 Mass. at 450. Here, the judge permitted the defendant to ask whether each witness discussed his or her citizenship status with the police or the prosecution. If the witness had not, the defendant was not permitted to inquire further. Once the witness testified that he or she had not conversed with the Commonwealth or curried any favor, there was no longer a "plausible connection" between the witness's citizenship status and potential bias (citation omitted). See Sealy, 467 Mass. at 624. Put another way, after the witnesses testified that they had not talked about their citizenship status with the Commonwealth, their status became irrelevant as a motive to lie. Id. at 624-625. See Johnson, 431 Mass. at 538 (affirming exclusion of cross-examination where "the import of the question was too attenuated to create a remote possibility of . . . bias").

In one instance, a detective told a witness for the Commonwealth that he would be willing to write that witness a letter if the witness decided to apply for citizenship. At that point, that witness's citizenship status was relevant to a potential bias in his testimony. The judge expressed her willingness to allow the defendant to explore this bias in

cross-examination. We agree with the defendant that the fact the Commonwealth had the appearance of a quid pro quo with one of its witnesses suggests that inducements may have been made to other witnesses. Contrary to the defendant's position, however, the judge did not foreclose the potential bias line of questioning with other witnesses. Instead, she permitted the defendant to lay the foundation for potential bias by inquiring if the witnesses had spoken with police or prosecutors about their citizenship status. It was a necessary preliminary question that needed to be answered in the affirmative to demonstrate a possibility of bias before the judge would allow the defendant to further explore bias. See Magadini, 474 Mass. at 603-605. The defendant's claims that other witnesses were biased are "grounded only in speculation." Meas, 467 Mass. at 451.

In addition, the judge was permitted to limit the defendant's cross-examination of the witnesses to prevent embarrassment and harassment. See Mass. G. Evid. § 611(a)(3) (2018). There is no reason to believe that the fact that the witnesses may not have been legal residents of the United States was evidence of their ability to be truthful. In reality, a witness's status as an undocumented immigrant, for a variety of reasons, would make the witness less likely to cooperate with the government. See Commonwealth v. Morgan, 449 Mass. 343, 364

n.17 (2007) (fact that witness was aware that he might be subject to prosecution for illegal entry into country "adds nothing" to discussion of bias).

The judge's well-reasoned balancing of the defendant's rights with the interests of the Commonwealth and its witnesses was commendable. The judge did not abuse her discretion in limiting the defendant's cross-examination of the Commonwealth's witnesses.

b. Use of interpreters. In his appeal from the denial of his motion for a new trial, the defendant argues that the procedure suggested by the trial judge, and approved by defense counsel, of using two interpreters, one for the non-English speaking witnesses and one for the defendant at counsel's table, violated his constitutional right to due process of law. He suggests that he was not allowed to hear actual witness testimony, but rather testimony that went through two translators -- Spanish translated into English for the jury, which was then translated back into Spanish for the defendant. "Where the appeal from the denial of a motion for a new trial is considered with the direct appeal from a conviction of a capital crime, we review the denial of that motion to determine if the judge committed an abuse of discretion or other error of law and, if so, whether such error created a substantial likelihood of a miscarriage of justice." Commonwealth v. Chatman, 466

Mass. 327, 333 (2013), citing Commonwealth v. Leng, 463 Mass. 779, 781 (2012).

Neither the defendant nor defense counsel filed an affidavit in support of the motion for a new trial. The only affidavit submitted was from one of the interpreters at trial, who, as the motion judge noted, had been dismissed by the trial judge. The motion judge did not credit the interpreter's affidavit and held that it was "based exclusively on [her] own unsubstantiated and unsettled personal opinions and pure speculation of what may have been going on in the mind of the defendant who was represented by experienced trial counsel who agreed to the procedure used." This uncredited affidavit is the sole support for the defendant's argument on appeal.

Adopting the uncredited affiant's assertions, the defendant argues that he was forced to wear a "double auricular headset" that prevented him from hearing actual witness testimony. Moreover, he contends that the microphones at the witness stand were muted, which forced him to rely specifically on his interpreter's translation of the translation of the witnesses' interpreter.

Our review of the record, however, tells a different story. On the first day of jury empanelment, the trial judge discussed with the Commonwealth and defense counsel how they would like to use interpreters for the trial. The judge stated:

> "I think we need two interpreters for the time that we have a Spanish-speaking witness. And the reason for this is that the defendant, in my view, needs to hear what the translation is, not to hear it in Spanish. I have had experience with discrepancies not involving any of the interpreters here but with issues of discrepancies over the years sufficient for me to believe that to ensure, particularly in a first-degree murder case, to ensure that the defendant knows exactly what the interaction is because [defense counsel] is not Spanish speaking, that we should have two interpreters at all times. . . . I think that we need that. . . . I mean, correct me, counsel, if you feel to the contrary."

In response, defense counsel stated: "No. I absolutely think I need an interpreter with me at counsel table with the defendant." During jury selection, the judge instructed potential jurors that there would be multiple "interpreters . . . throughout the trial" and that they were required to "follow what the interpreter says in English as the response or the question even if [they] believe, based on [their] understanding of Spanish or Portuguese, that the interpreter is not accurate." Later, while questioning a potential juror who was concerned because he was hard of hearing, the judge assured the juror that "the interpreter [would] be speaking into a microphone."

After reviewing the transcript, we discern no abuse of discretion. First, the judge conferred with defense counsel before implementing this procedure. Defense counsel agreed with the procedure and did not object to its practice at any point during trial. See Commonwealth v. Festa, 369 Mass. 419, 428

(1976); Commonwealth v. Boiselle, 16 Mass. App. Ct. 393, 399 (1983), citing Festa, supra. ("A barren record does not create a presumption of prejudice in the defendant's favor").

Second, the use of multiple interpreters complied with the governing interpreter procedures in the Trial Court. See Standards and Procedures of the Office of Court Interpreter Services, 973 Mass. Reg. 3 (Apr. 18, 2003), promulgated pursuant to G. L. c. 221C, § 7. Section 14.03, which covers the simultaneous use of multiple interpreters, states in part:

> "(A) When there are multiple [limited English proficiency] parties, an interpreter or team of interpreters, using appropriate equipment, may interpret simultaneously for all of the parties.
>
> "(B) When a witness requires an interpreter, however, a separate interpreter must be assigned to the witness to allow parties to communicate with counsel as necessary in a timely manner."

The judge's procedure mirrored the guidance given by the Standards and Procedures of the Office of Court Interpreter Services.

Finally, the judge correctly instructed the jury that it was the translation of the witnesses' testimony that was to be considered as evidence. Commonwealth v. Portillo, 462 Mass. 324, 328 (2012) (when witness testifies in foreign language, English translation is only evidence, not testimony in original language). Even if the defendant could not hear the Spanish testimony, it was the translation of the testimony that was

considered by the jury, and the defendant received a Spanish translation of the English translation provided to the jury.

3.  Conclusion.  For these reasons, we affirm the defendant's conviction and the denial of his motion for a new trial.  Furthermore, we have reviewed the record in its entirety and see no basis to grant extraordinary relief under G. L. c. 278, § 33E.

So ordered.