NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-528

COMMONWEALTH

vs.

TIBERIAS ALBERT.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Superior Court jury convicted the defendant of six counts, including armed assault with intent to murder, aggravated assault and battery, and four firearms offenses.[1]  In this consolidated appeal from his convictions and the denial of his motion for a new trial, the defendant argues that he should have been allowed more extensive cross-examination of one of the Commonwealth's witnesses, and that his trial counsel provided ineffective assistance in various respects.  The defendant also asserts that Commonwealth v. Guardado, 491 Mass. 666, S.C., 493 Mass. 1 (2023), requires that we vacate the convictions on the

---

[1] Specifically, the firearm convictions were for:  two counts of possessing a large capacity firearm in violation of G. L. c. 269, § 10 (m), one count of unlawfully possessing a loaded firearm in violation of G. L. c. 269, § 10 (n), and one count of unlawfully carrying a firearm without a license in violation of G. L. c. 269, § 10 (a).

fifth and sixth charges because the Commonwealth did not present any evidence as to his lack of a firearm license.  We agree that those two convictions must be vacated but otherwise affirm.

Background.  1.  The Commonwealth's case.  There was no evidence that the victim knew the shooter.  The Commonwealth's theory was that on the afternoon of February 24, 2014, the defendant and the victim had a brief chance encounter outside the victim's home.  As a result of this interaction, the defendant -- for reasons not clear -- became enraged and shot the victim.

One of the Commonwealth's two key witnesses was Brittany Aguiar, who had given the defendant a ride to the residential area where the shooting took place.  Aguiar knew the defendant and was dating his much older half-brother, Ronald Alston, whom she later married.  Aguiar testified that on February 24, 2014, the defendant flagged her down for a ride and then requested that she stop on a particular street.  According to Aguiar, the defendant "didn't really explain why" he had her stop.  She testified that she observed him go up to the victim's door, where she saw him speak with the victim for "a few seconds, a few -- a few minutes at most, not even."  When the defendant returned to the vehicle, he appeared "definitely angry" and "frustrated."  She testified that she then observed him go into the back seat, remove an item from his "stuff," and walk towards

2

the victim with what "obviously was a gun" in his hand. According to Aguiar, she did not see the shooting, but heard a gunshot as she drove off, leaving the defendant behind.

The Commonwealth's other key witness was the victim, whose testimony was largely consistent with that of Aguiar. According to victim, he returned home that afternoon to find a "young kid" whom he did not recognize at his door. He testified that the man was "kind of Dominican looking, light skinned, not real dark," "maybe about 5'5, 5'6," and about sixteen or seventeen years old, "like, young." Although the victim did not identify the defendant as that man, and although when shown a photograph array months later he told the police he was fifty percent sure that the shooter was another man, his description of the shooter in large part matched Aguiar's description of the defendant.[2]

The victim testified that after he and the man exchanged words, the man went to a vehicle parked in front of the victim's house, where a woman matching Aguiar's description stood. According to the victim, shortly thereafter, the man returned

_____

[2] According to Aguiar, the defendant was about her height (5'3" or 5'4") and 160 to 180 pounds. She identified him from his booking photograph for the police, and that photograph was admitted in evidence. The defendant was twenty-one years old at the time of the shooting.

3

and shot him.  The victim testified that the man then ran towards the vehicle before the woman drove away.[3]

The Commonwealth also called other eyewitnesses who corroborated many of the details of Aguiar's account of the incident.  For instance, a neighbor testified that she heard a gunshot just after 5 P.M. that evening, and when she looked outside, saw a man running down the victim's driveway.  Beyond eyewitness testimony, a critical component of the Commonwealth's case was forensic evidence linking a firearm found at the location where the defendant was arrested to the shooting.  Specifically, the Commonwealth called a ballistics expert who testified that in his opinion, the spent projectile found outside the victim's home after the shooting came from the recovered firearm.  The caliber and manufacturer of the spent projectile matched those of ammunition found in a shoebox in Aguiar's vehicle, which she attributed to the defendant.  The police recovered the shoebox and other possessions of the defendant from the vehicle, including his photograph identification and Social Security card.

---

[3] The defendant tries to make much of the fact that the victim's testimony regarding when Aguiar drove off was inconsistent with Aguiar's testimony on this issue, and he even suggests that the victim observed the shooter get into the vehicle and drive away with Aguiar.  However, a close reading demonstrates that the victim did not testify that he observed the shooter get back into the vehicle after the shooting, but only run towards it.

4

2.  <u>The defense</u>.  The defendant mounted a vigorous multi-pronged defense.  First, he highlighted inconsistencies in the eyewitness accounts, and underscored that the victim identified someone other than the defendant as the shooter.  Second, the defendant suggested that the spent projectile was planted at the scene because it was "unbelievable" that this evidence was passed over in the initial investigation only to be found by an officer "casually looking down" months later.  Third, he portrayed Aguiar as a biased witness attempting to curry favor with the Commonwealth because she had been facing an open criminal charge at the time of the shooting.  Fourth, he sought to raise doubt in the jurors' minds about whether Alston, the defendant's half-brother and Aguiar's boyfriend (and later husband), was the actual shooter.  Because this appeal primarily relates to these last two defenses, we turn to the relevant facts in some detail.

a.  <u>Pending charge</u>.  Prior to trial, the defendant filed a motion seeking to cross-examine Aguiar as to incentives she may have received in her criminal case in exchange for testifying against the defendant.  That case (where Aguiar was charged with sexual conduct for a fee) was pending at the time of the shooting, but was dismissed at the recommendation of probation

upon payment of court costs in March 2014.[4]  The judge largely
ruled in the defendant's favor, allowing him to cross-examine
Aguiar as to the "existence and pendency" of the charge on the
dates of the shooting, her interview with police, and her grand
jury testimony.[5]  Over his objection, the judge precluded the
defendant from inquiring about the underlying details of the
case, finding that this question went "way beyond" his motion,
which "deal[t] with the issue of a pending case."

Aguiar testified that she had an open criminal matter when
she first met with the police and testified before the grand
jury.  She further testified that she did not seek to curry
favor with the district attorney's office at that time, and that
at no point did she receive any sort of written agreement from
the district attorney.

b.  Third-party culprit defense.  Although the defendant
made some efforts to implicate Alston in the shooting, the state
of the evidence placed significant limitations on his ability to

---

[4] As the defendant acknowledged at the hearing before us, this is
not an unusual disposition for this type of case.

[5] Alston was charged in Aguiar's case with deriving support from
prostitution.  It is clear that the defendant considered having
Alston testify because his motion to cross-examine Aguiar also
included a request to cross-examine Alston.  However, neither
side called Alston as a witness.  As to the charge against
Alston, the docket from that case appears to suggest that on
August 27, 2014, Aguiar appeared at a pretrial hearing and
asserted her spousal privilege.

develop this defense.  For instance, contrary to the various descriptions of the shooter and the defendant, Alston was described as six feet tall, around 200 pounds, and in his late thirties or early forties at the time of the shooting.  A photograph of Alston was also admitted in evidence.  Moreover, no witness observed a second man with the victim, let alone one matching Alston's description.

The only testimony that placed Alston at the scene was that of the defendant's girlfriend, Kristen Silvia.  Specifically, Silvia testified that she was on the phone with the defendant around the time of the shooting and that she heard Aguiar and Alston speaking in the background.  She claimed that she heard "high levels of arguing" and then a voice that she "distinctly" recognized as Aguiar's saying "let's get out of here," before a vehicle door closed.

Given the limited nature of any evidence implicating Alston, the defendant sought to emphasize the closeness of Aguiar's and Alston's relationship to develop her motive to lie to protect Alston.  On cross-examination, Aguiar admitted that she and Alston were moving in together at the time of the shooting, that she had Alston listed as the "love of her life" and his mother listed as "mother-in-law" in her phone contacts

7

at that time, and that they were married in August 2014, shortly after Aguiar spoke with the police.[6]

3. Subsequent proceedings. In 2019, the defendant filed a timely motion for a new trial alleging that trial counsel was ineffective in five discrete respects, for: (1) failing to request a spousal privilege instruction; (2) failing to object to the use of an outdated reasonable doubt instruction; (3) failing to request an eyewitness identification instruction; (4) failing to introduce Aguiar's phone records; and (5) failing to impeach Aguiar with available video evidence.[7] He further suggested, without explanation, that the "cumulative prejudice from above failures of trial counsel neutered the third party culprit defense." Trial counsel submitted an affidavit and testified at the evidentiary hearing on the motion before a judge different from the trial judge (the trial judge having retired). In 2021, the defendant's motion was denied.

---

[6] As discussed infra, the defendant now claims that trial counsel should have requested a jury instruction as to the spousal privilege that would have allowed Aguiar to avoid testifying against Alston should he have been charged with the shooting. It appears that the only time this instruction was discussed at trial was when the defendant sought to admit details as to Aguiar's understanding of the spousal privilege through the testimony of Alston's mother (who also was the defendant's mother). The judge found that she was not an appropriate witness through which to do so, but left open the possibility that the relevance of the spousal privilege could come in through another witness.

[7] The video evidence issue was not raised on appeal.

Discussion.  1.  Limitation on cross-examination.  "The judge has broad discretion to determine the scope and extent of cross-examination" of a "prosecution witness[] for bias or prejudice."  Commonwealth v. Chicas, 481 Mass. 316, 320 (2019).  While a "judge may not bar all inquiry into the subject if the defendant demonstrates a possibility of bias, [t]he right to cross-examination . . . is not without limits, and it must be accommodated to other legitimate interests" (citations and quotations omitted).  Id.  "We review the judge's decision to limit the defendant's cross-examination [of a witness] for an abuse of discretion."  Id. at 319.

As an initial matter, we reiterate that the defendant was allowed to and did in fact cross-examine Aguiar as to the existence of her criminal charge and whether she received any favors in that case (which she denied).  The defendant now raises two issues with the judge's limiting further inquiry into Aguiar's charge:  (1) that the timing of the dismissal could indicate Aguiar attempted to curry favor in exchange for her testimony incriminating him, and (2) that the underlying details about the charge and what they would have revealed about Aguiar's and Alston's relationship would have supported the third-party culprit defense.

In considering the defendant's claims of error, it is important to keep in focus what was being argued to the trial

judge at the time he made his rulings. In his motion, the defendant requested only that he be allowed to cross-examine Aguiar as to her case "pending at the time that the incident in the instant case occurred . . . because [the charge] may form the basis of bias and motive to lie, in an attempt to curry favor with the same District Attorney's Office that is prosecuting the defendant in the instant case." However, when the judge heard from both parties on the motion, the defendant shifted his focus also to seek to elicit certain details about that case, including that the police report revealed that Alston had served as Aguiar's pimp. According to the defendant, Alston's "involve[ment] . . . ma[de] a great deal of difference" because, despite the evidence that Aguiar "knew [Alston] intimately in [sic] many different levels," she initially told the police she did not know him. The judge was understandably and justifiably concerned that the nature of the charge had the potential to "impugn Ms. Aguiar." Counsel was unable to articulate how the nature of the underlying charge was relevant to Aguiar's bias or any other defense.

Notably, the defendant was not arguing at this time that the evidence that Alston was Aguiar's pimp somehow bore on whether Alston was the shooter. Based on what was presented to him, the judge concluded that he "[didn't] see a basis for the admissibility of this Alston testimony" as "this [was] all

10

speculation." The judge therefore precluded any inquiry into the underlying details of the charge. Especially where the defendant had not connected the dots as to how the charge that Aguiar faced might be relevant to the third-party culprit defense, we discern no abuse of discretion in the judge's prohibition about the specific nature of the charge that Aguiar faced.[8]

Nor do we discern any abuse of discretion in the judge's limiting the cross-examination about the open charge to the period that included Aguiar's initial police interview and her testimony to the grand jury. See Commonwealth v. Woollam, 478 Mass. 493, 504 (2017), cert. denied, 138 S. Ct. 1579 (2018) (cross-examination properly limited where no "quid pro quo agreement involving open cases"). Indeed, this was the very time frame that the defendant had specified in his motion. The defendant now claims that he should have been allowed to inquire about the later disposition of the charge (which occurred after Aguiar already had testified to the grand jury and long before the trial). Even putting aside that the defendant received what he requested as to the time period in question, he is unable to articulate how being able to ask Aguiar about the disposition of

---

[8] We separately address below whether trial counsel's failure to better formulate the third-party culprit defense could amount to ineffective assistance.

11

the charge she had faced would have provided him appreciable value as to demonstrating her potential bias. See Commonwealth v. Rodwell, 394 Mass. 694, 700 (1985) ("We have suggested that bias because of gratitude for past benefits from the Commonwealth might be relevant, but, at the same time, we indicated that the pendency of criminal charges is a much stronger source of human motivation").

2. Ineffective assistance of counsel. "Where a motion for a new trial is based on ineffective assistance of counsel, the defendant must show that (1) the 'behavior of counsel [fell] measurably below that which might be expected from an ordinary fallible lawyer' and (2) such failing 'likely deprived the defendant of an otherwise available, substantial ground of defence.'" Commonwealth v. Tavares, 491 Mass. 362, 365 (2023), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). We address first the defendant's discrete claims of ineffective assistance that were the subject of his motion for new trial.

Two of the issues the defendant raises plainly amounted to reasonable tactical decisions. Trial counsel offered sound reasons for why he decided not to request the model eyewitness instruction, which would have undercut the strongest evidence in the defendant's favor: the fact that the victim identified someone else as the shooter. With respect to his decision not to introduce Aguiar's phone records, trial counsel stated that

12

these records would have corroborated much of her testimony. Trial counsel's decisions in this regard were not "manifestly unreasonable."  See Commonwealth v. Wentworth, 482 Mass. 664, 678 (2019) (because the "ineffective assistance of counsel claim is based on a tactical or strategic decision, the test is whether the decision was 'manifestly unreasonable' when made" [citation omitted]).

As to the remaining discrete arguments, trial counsel acknowledged that it would have been better practice to request the spousal privilege instruction and to object to the use of the outdated reasonable doubt instruction.  The actual spousal privilege instruction had no direct application where Alston was not the defendant.  See G. L. c. 233, § 20 par. second ("neither [spouse] shall be compelled to testify in . . . [a] criminal proceeding against the other").  While the judge presumably had the authority to have instructed the jury on the privilege as a matter of potentially relevant background law -- see, e.g., Commonwealth v. Grant, 78 Mass. App. Ct. 450, 464 (2010) -- whether to exercise such authority would have lain within the judge's discretion.  See Commonwealth v. Phong Thu Ly, 19 Mass. App. Ct. 901, 902 (1984) ("A judge need not give instructions on every subsidiary fact and possible inference"). We do not view counsel's failure to request such an instruction as falling measurable below that of ordinary fallible counsel.

13

See Tavares, 491 Mass. at 365.  Neither does the failure to object to the outdated reasonable doubt instruction constitute ineffective assistance.  See Commonwealth v. Whitson, 97 Mass. App. Ct. 798, 801-803 (2020).  Moreover, given the limited utility of the third-party culprit defense here, any such error would not have "likely deprived the defendant of an otherwise available, substantial ground of defence [quotation omitted]."  Tavares, supra.

Having addressed the discrete issues that were the subject of the defendant's motion for new trial, we now turn to the defendant's suggestion -- raised for the first time in this appeal -- that his trial counsel was ineffective based on his failure to better articulate how the nature of Aguiar's prostitution charge may have borne on the third-party defense that Alston was the actual shooter.  Because this issue was not raised as part of the motion for new trial, the factual basis of it must appear "indisputably" on the record for this argument to succeed.  See Commonwealth v. Davis, 481 Mass. 210, 223 (2019).

As noted, the only direct evidence that placed Alston at the scene was Silvia's unverified and arguably biased testimony. That testimony presented a double-edged sword:  while, if credited, it served to place Alston at the scene of the shooting, it did so at the expense of also placing the defendant there.  In addition, it bears mentioning that while trial

14

counsel initially planned to have Alston testify, he ultimately did not call him as a witness.  We do not know why counsel did not do so, and it would obviously be inappropriate to speculate about the reasoning behind this choice.  See Commonwealth v. Britto, 433 Mass. 596, 602 (2001) ("Whether to call a witness is a strategic decision").  For present purposes, it suffices to note that the third-party culprit defense was hardly as robust as the defendant now suggests and that, based on the current state of the record, we cannot fault counsel for not pressing it further at trial.[9]

Conclusion.  As the Commonwealth has acknowledged, in light of Guardado, 493 Mass. at 1-2, we vacate the defendant's convictions of unlawfully possessing a loaded firearm in violation of G. L. c. 269, § 10 (n), and of unlawfully carrying

---

[9] We do not mean to suggest that had trial counsel better articulated how the nature of the charge that Aguiar faced might have borne on the third-party culprit defense, he would have been entitled to cross-examine her about that charge.  The judge would have retained significant discretion about whether to allow such cross-examination, especially in light of the potential for the nature of the charge to unfairly impugn Aguiar's credibility.  See, e.g., Commonwealth v. Keohane, 444 Mass. 563, 571-572 & n.6 (2005) (limiting cross-examination on racial animus motive that would have supported third-party culprit defense where asserted motive grounded in speculation and defendant was allowed to question witnesses on the existence of their criminal records).  See also Chicas, 481 Mass. at 321 ("judge was permitted to limit the defendant's cross-examination of the witnesses to prevent embarrassment and harassment" [citation omitted]).

15

a firearm without a license in violation of G. L. c. 269, § 10 (a), and the verdicts are set aside.  We affirm the remaining judgments.  We also affirm the denial of the defendant's motion for new trial.

<u>So ordered</u>.

By the Court (Milkey, Walsh & Smyth, JJ.[10]),

*Joseph F. Stanton*

Clerk

Entered:  November 16, 2023.

---

[10] The panelists are listed in order of seniority.