NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-734

COMMONWEALTH

vs.

DYLAN M. WELCH.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Juvenile Court jury convicted the defendant of rape of a child by force resulting in serious bodily injury and extortion by threat of injury.[1] On appeal the defendant argues that the judge abused her discretion by dismissing a prospective juror with autism and by limiting the defendant's cross-examination of the victim, that the judge should have sua sponte excluded screening test results for the presence of blood as unduly prejudicial, and that the prosecutor made improper statements in her closing argument. We affirm.[2]

---

[1] The Commonwealth also charged the defendant as a youthful offender with two counts of assault with intent to rape a child. The judge allowed the defendant's motion for a required finding of not guilty on one of the assault charges, and the jury acquitted the defendant on the remaining charge.

[2] We acknowledge the amicus brief submitted by the Disability Law Center.

Background.  The defendant and the victim first met in summer school in 2017 and stayed in contact through text messages and social media.  Their communication grew more frequent and sexual in nature during the spring of 2019.  The victim eventually met the defendant in June 2019 at his house in Pittsfield, and the two had consensual sex.

After their June encounter, the defendant started texting the victim "all the time" and sending her "threats and stuff." In early July he said that he would "have people show up to [her] house to . . . beat [her] up" because she told someone they had sex.  The defendant's threats caused the victim to block him on Facebook Messenger.

Sometime later that summer, the defendant and the victim started talking again through Instagram, and they met up in September once more to have sex.  Over the following weeks, the defendant continued asking the victim to spend time with him, but she declined on multiple occasions.  The victim avoided being with the defendant because she "thought it was going to result in, like, sex."  The defendant's messages became increasingly aggressive as the victim came up with excuses not to see him, and he threatened her again that he would have "girls show up at [her] house to beat [her] ass."  The victim was unsure "what was going to happen if [she] didn't . . . end up meeting up with" the defendant because of "the threats" and

2

grew "tired of him . . . asking all the time."  She ultimately agreed to go for a walk with him, but only after confirming that "nothing was going to happen."

On October 14, 2019, the victim met the defendant at his house, and they walked toward the train tracks at the Berkshire Regional Transit Authority (BRTA) station.  Video footage from BRTA captured them walking westward on the tracks at 2:11 P.M. before returning east at 3:18 P.M.  The victim estimated that she followed the defendant for ten or twenty minutes on the train tracks until he led her into the woods.

Once they were in the woods, the defendant pushed the victim to the ground, demanded that she take her clothes off from the waist down, put lubricant on his hand, and inserted "his whole hand" into her vagina.  It was "hurting really bad, so . . . [she] continuously told him to . . . stop and . . . let [her] leave."  When the defendant took his hand out, the victim noticed that it was covered with "a lot of blood."  He then held her against a tree to make her perform oral sex on him while repeatedly slapping her face.  The victim tried to stop, but the defendant said that if she did, he was going to "try to do . . . anal."

When the assault ended, the victim and the defendant left the woods together.  They parted ways at some point on the train tracks, after which the victim continued walking on the tracks

3

for what felt like "a long time" before finding a sidewalk.  She "kept walking down the sidewalk for a good amount of time" until she came across XtraMart, a gas station, at approximately 4:22 P.M.  By the time the victim arrived, she was lightheaded from "bleeding . . . really bad."  The victim used the phone at XtraMart to call home for a ride, and her mother arrived to pick her up at approximately 4:30 P.M.  Her mother noticed that the victim's pants were "soaked in blood" and, sometime after arriving home, contacted the police.

The responding officer called an ambulance after seeing that the victim was losing a lot of blood.  At the hospital the victim was diagnosed with a grade 3 or 3a laceration of her vagina that extended to her anal sphincter muscle.  The injury required surgery to repair and a laparoscopy to remove excess blood from the victim's abdomen.  She was discharged from the hospital one week later.

Discussion.  1.  Excusal of juror.  In the course of empaneling the jury, the judge informed the attorneys that a court officer had alerted her that juror no. 65 had "severe autism."  The judge further stated that she believed it would "become self-evident when [juror no. 65] presents that he probably wouldn't be a fair and impartial juror" but that she did not "want to jump to conclusions" or "discriminate against him based on his disability."  During the judge's voir dire,

4

juror no. 65 confirmed that he had not raised his hand to any of the questions the judge asked to the venire, that he could be fair and impartial, that he had just graduated from high school, and that he was available for a two-week trial. He also confirmed that neither he nor anyone that he was close to had been a victim or accused of sexual assault and that he was not a member of any group that provides advocacy or counseling for sexual assault survivors. After this initial voir dire, the judge stated that she was "inclined to excuse [juror no. 65] for cause, given his presentation" but "wanted to give [the attorneys] a chance to object" first. When both attorneys indicated they had questions for the juror, the judge allowed voir dire to proceed.

Defense counsel followed up with one additional question -- whether juror no. 65 would be able to pay attention to "a lot of records and a lot of testimony" over the course of several days. Juror no. 65 replied, "Yes, I think so. I'm a pretty good listener." At this point the judge resumed questioning the juror, asking whether he had an individualized education plan in high school and what kind of supports he had received. Juror no. 65 replied that he was given extra time on assignments because he "was a little bit slower than the other students." When the judge asked "why is that," juror no. 65 stated that he was "just a little bit different 'cause on the autistic

5

spectrum."  After the prosecutor indicated she had no questions, the judge stated again that she "intend[ed] to challenge [juror no. 65] for cause" but that, as it was "a close case," she wanted to first "inquire of the attorneys whether they ha[d] any objection to that."  Both attorneys stated they had no objection, and the judge excused the juror.

Despite his lack of objection at trial, the defendant now argues that he is entitled to a new trial because the judge excused juror no. 65 without conducting an adequate inquiry into whether he was competent to serve.  A judge is accorded a large degree of discretion in the jury selection process, which extends to assessing a prospective juror's competency.  See Commonwealth v. Heywood, 484 Mass. 43, 45 (2020).  But neurodivergence alone, without any indication of an effect on competency to serve, is not a proper basis on which to exclude a juror for cause.  See G. L. c. 234A, § 3 ("All persons shall have equal opportunity to be considered for jury service").

Here, we agree with the defendant and the amicus curiae that the voir dire conducted by the judge was not appropriately designed to elicit relevant information about juror no. 65's competency.  Juror no. 65's responses during the judge's initial voir dire, and his response to defense counsel's follow-up question, do not on their face indicate that he would be unable to perform the duties of a juror.  If the judge still had

6

concerns about his competency, she should have asked questions focused on that issue, such as whether there were any impediments to juror no. 65's ability to access and analyze the evidence and, if so, whether accommodations could be made to allow him to serve. Cf. Heywood, 484 Mass. at 45-46 (empanelment of blind juror appropriate where judge asked whether he would "'feel comfortable' with having another juror describe the photographic evidence" and whether he could follow testimonial evidence without assistance, and juror responded affirmatively). That juror no. 65 had an individualized education plan and needed extra time on his school assignments is insufficient standing alone to rebut the presumption that he is competent. See id. at 47 ("General Laws c. 234A, § 3, creates a presumption of competency for all jurors, including those with disabilities, who then must be evaluated on a case-by-case basis to determine whether service is 'feasible'"). Moreover, while we do not preclude the possibility that it may be appropriate to exclude a juror based on "presentation," to the extent the judge did so here, she failed to provide specific findings on the record, adequate to permit appellate review, as to why juror no. 65's presentation translated to concerns about his ability to serve. Cf. Commonwealth v. Maldonado, 439 Mass. 460, 466 (2003).

All that said, we acknowledge that the judge only excused juror no. 65 after both parties stated on the record that they did not object to her doing so. We therefore cannot know what additional questions the judge might have asked had the parties not acquiesced. In these circumstances we review the judge's decision for a substantial risk of a miscarriage of justice, Heywood, 484 Mass. at 45,[3] and we discern no such risk. As the defendant more or less concedes, nothing in the record suggests that the dismissal of juror no. 65 affected the result of the trial or deprived the defendant of a fair and impartial jury. See Commonwealth v. Lacoy, 90 Mass. App. Ct. 427, 435 (2016) (no substantial risk of miscarriage of justice where defendant did not show "serious doubt" as to jury's impartiality). The defendant is thus not entitled to a new trial on this basis. See Commonwealth v. Mora, 82 Mass. App. Ct. 575, 578-579 (2012).

We are also unpersuaded by the defendant's argument that the judge's dismissal of juror no. 65 violated his right to a jury drawn from a fair cross-section of the community. The defendant has not established on this record that people with

---

[3] The defendant claims that the improper dismissal of juror no. 65 constituted structural error, thereby relieving him of the obligation to demonstrate prejudice. Even assuming that the dismissal would qualify as structural error, but see Commonwealth v. Williams, 481 Mass. 443, 454-455 (2019), structural error can still be waived by the defendant's failure to object. See Commonwealth v. Ralph R., 490 Mass. 770, 785 (2022); Heywood, 484 Mass. at 45.

autism, assuming they constitute a "distinctive group," were "significantly underrepresented in the venire" as a result of juror no. 65's dismissal.  Commonwealth v. Evans, 438 Mass. 142, 149-150 (2002).  Our decision in Commonwealth v. Alves, 96 Mass. App. Ct. 540, 547 (2019), in which we presumed prejudice, is distinguishable for at least this reason.[4]

2.  Limitations on cross-examination of the victim.  At around 4:02 P.M. on the third day of testimony, the judge brought counsel to sidebar.  The judge informed defense counsel that he had cross-examined the victim for "well over two hours" and asked how much more time he needed.  When counsel replied that he anticipated another fifteen or twenty minutes, the judge requested an offer of proof.  Counsel explained that he wanted to ask more about "location," which appeared to refer to the location of the assault in light of the victim's path of travel, but the judge noted that that topic had been covered.  Counsel then sought to inquire about why the victim continued to speak with the defendant after blocking him on social media.  The judge allowed further inquiry on that issue, and counsel asked a few more questions before ending his cross-examination for the

---

[4] While we acknowledge the amicus curiae's request that we set out specific procedures for trial judges to follow when inquiring of jurors who are neurodivergent, we do not believe this case to be the appropriate vehicle to do so, given the parties' acquiescence to the dismissal of juror no. 65 and the undeveloped state of the record.

9

day.  After the jury were excused, counsel raised that he also wanted to ask the victim about photographs she took in the hospital, noting that "[it] was a little bit rushed at the end there."  The judge suggested that the parties stipulate to the admission of the photographs.[5]

The next day the defendant filed a written objection to the termination of cross-examination, in which he identified the following additional topics he wanted to cover with the victim:

> "Even though Counsel only gave as an offer of proof that he wished to inquire about the social media blocking, his work flow was taking the testimony east from the BRTA station, which would have segued into what was said between her and the Defendant upon parting ways, and to the Xtramart telephone call, what she said to the sales clerk, whether there was blood on her pants, and her use or non-use of underpants that the mother had testified actually belonged to her."

The judge overruled the objection, which the defendant now challenges as an abuse of discretion.  As the judge stated in her ruling, all of the issues raised were preserved, so our review is for prejudicial error.  See Commonwealth v. Hobbs, 482 Mass. 538, 558 (2019).

Criminal defendants have the constitutional right to cross-examine witnesses.  See Commonwealth v. Chicas, 481 Mass. 316, 320 (2019).  Nevertheless, the right to cross-examine is subject

---

[5] After the Commonwealth later refused to so stipulate, the photographs were marked for identification for purposes of appeal.

to reasonable limitations "based on concerns about . . . harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." Id., quoting Commonwealth v. Johnson, 431 Mass. 535, 540 (2000). A judge's decision to limit cross-examination is reviewed for an abuse of discretion. See Chicas, supra at 319.

The judge was well within her discretion to terminate further inquiry on the topic of the victim's path of travel and the location of the assault. Considering that the defense at trial centered on consent, the testimony would have been of limited relevance. See Johnson, 431 Mass. at 538 ("judge did not abuse her discretion by excluding questions that would not likely lead to any relevant evidence"). Moreover, the victim had already testified that the assault occurred in the woods near train tracks in an area that she was unfamiliar with, that she did not recognize the location captured in the BRTA videos, and that she could not identify any landmarks or otherwise point to where the assault happened. Further questioning on the subject would have been cumulative of that testimony. See Commonwealth v. Rosadilla-Gonzalez, 20 Mass. App. Ct. 407, 414 (1985) (no abuse of discretion in excluding "obviously repetitive questions").

In fact all of the topics that the defendant sought to ask about were either of limited relevance to his defense of consent

11

or cumulative of other testimony.  The defendant does not explain how questioning the victim about the photographs she took in the hospital would have led to relevant evidence.[6]  And the remaining subjects identified in the defendant's objection were covered in previous testimony.[7]  The judge therefore properly limited cross-examination on these subjects.  See Commonwealth v. Jordan, 439 Mass. 47, 55 (2003).

The defendant has also failed to demonstrate prejudice.  He suggests that cross-examination on these topics would have led to testimony supporting an inference that the victim's injury occurred from some other cause.  But even putting aside the implausibility of that theory in light of the evidence, the defense at trial was consent.  None of the topics that the defendant sought to explore would have supported his claim of consent in any material way.  The restrictions on cross-

_____

[6] The photographs were digitally altered "selfies."

[7] Regarding what was said between the defendant and the victim as they parted ways, the victim testified that the defendant told her "to keep . . . walking straight," while the defendant testified that he told the victim to "go fuck herself."  The victim previously covered her conversation with the XtraMart clerk, testifying that she asked him if he had a phone she could use.  She also previously testified that she was "bleeding . . . really bad" when she arrived at XtraMart, and her mother confirmed that the victim's pants were "soaked in blood."  In addition, there was already evidence introduced that the underwear worn by the victim matched her size and not her mother's.

examination therefore did not undermine his chosen defense.  See Commonwealth v. Daye, 411 Mass. 719, 735-736 (1992).

3.  Admission of screening test results.  At trial the Commonwealth introduced the results of screening tests for blood, which suggested that blood was present in six stains on the sweatshirt worn by the defendant during the assault. Subsequent confirmatory testing for blood came back negative for two stains.  Because of the small size of the remaining four stains, they were not subjected to confirmatory testing but instead preserved for DNA testing.  DNA testing on two of the stains, located on the interior and exterior right front sleeve of the sweatshirt, indicated the presence of DNA as to which the defendant and the victim were possible contributors.

The defendant did not object to the admission of the screening test results at trial but now asserts that the judge abused her discretion by failing to sua sponte exclude them as unduly prejudicial.  We discern neither error nor a substantial risk of a miscarriage of justice.  See Commonwealth v. Gabbidon, 398 Mass. 1, 7 (1986).  The Supreme Judicial Court has held that results of preliminary screening tests for blood are admissible without the need for confirmatory evidence.  See Commonwealth v. Norris, 483 Mass. 681, 691 (2019); Commonwealth v. Duguay, 430 Mass. 397, 401-402 (1999).  Also, the evidence was not unduly prejudicial because it was presented at trial "with an abundance

of precaution."  Duguay, supra at 402.  A forensic scientist testified that "a screening test . . . doesn't confirm whether or not a biological sample is present" without further testing "because the screening test does react with substances other than blood."  Another forensic scientist was asked whether she could confirm, with respect to the stains on the sweatshirt, "that any of that was proven to be blood," to which she replied, "[N]o, we can't determine the source of the DNA."  In light of this testimony, we are bound by Norris and Duguay to reject the defendant's argument.

4.  Closing argument.  The defendant challenges the prosecutor's closing argument on three grounds.  Because the defendant did not timely object at trial,[8] we review to determine whether any error created a substantial risk of a miscarriage of justice.  See Commonwealth v. Cuffee, 492 Mass. 25, 32 (2023).

The defendant first contends that the prosecutor misconstrued the evidence by arguing that, when the defendant removed his hand from the victim's vagina, "[t]his is where the blood from [the victim] -- the presumptive tests for blood for

_____

[8] The defendant filed a written objection to the portion of the prosecutor's closing argument that asserted there was blood on the sweatshirt.  This objection did not preserve the issue, however, because it was made after the jury charge.  See Commonwealth v. Allison, 434 Mass. 670, 687 (2001) ("The defendant's objection to the statement, made after the jury instructions, was too late").

14

that DNA is on the inside cuff of his sweatshirt." The prosecutor's statement was supported by the results of the screening tests and DNA tests and the victim's testimony that she saw blood on the defendant's hand when he removed it from her vagina. As this portion of the prosecutor's closing was a fair inference from the evidence, it was within the bounds of a proper closing argument. See Cuffee, 492 Mass. at 32.

The defendant's second claim of error is that the prosecutor misstated the evidence by suggesting that the assault could have occurred near XtraMart.[9] Because this argument was also a fair inference from the evidence, it was not improper. The prosecutor noted earlier in her closing that the only evidence placing the assault in a specific area was the defendant's testimony, given that the victim "absolutely had no idea where she was on those railroad tracks." The prosecutor then explained that about one hour elapsed between the last BRTA video and the victim's arrival at XtraMart. It was within this context that the prosecutor suggested that the assault could have happened after the BRTA video and closer to the XtraMart. See Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 231

_____

[9] Specifically, the prosecutor stated that "[t]here's an hour for them to travel that course -- that path along the tracks together to a point near the XtraMart. To a point behind the XtraMart, where there's a grassy area. And, there certainly is enough time for a rape to occur like it did."

15

(1992) ("Remarks made during closing arguments are considered in the context of the entire argument").  Furthermore, any potential error in the statement was mitigated by the judge's instruction that closing arguments are not evidence, which we presume that the jury followed.  See Commonwealth v. Silanskas, 433 Mass. 678, 702 (2001).

Finally, the defendant contends that the prosecutor improperly appealed to the jury's sympathy by stating that the victim's mother contacted the police "because it was apparent something bad -- something evil had just happened."  Although we agree that the statement was ill-advised, it was "unlikely to have affected the jury's verdict, and therefore is not cause for reversal."  Silanskas, 433 Mass. at 702.  The prosecutor was not referring to the defendant's character but was characterizing what happened to the victim as "evil."  Moreover, the judge instructed the jury that closing arguments are not evidence and that the jury were "not to be swayed by prejudice or by sympathy, by personal likes or dislikes towards either side."

16

Again, we assume that the jury followed these instructions.  See id.

Judgments affirmed.

By the Court (Vuono, Shin & Toone, JJ.[10]),

Assistant Clerk

Entered:  May 29, 2024.

---

[10] The panelists are listed in order of seniority.